445 A.2d 121

**Theodore J. QUASHNOCK, and Joanne M. Quashnock, his wife,**

v.

**Eldred C. FROST, and Jean L. Frost, his wife, Appellants.**

Superior Court of Pennsylvania.

Argued April 23, 1981.

Filed April 30, 1982.

Anthony S. Guido, DuBois, for appellants.

David P. King, DuBois, for appellees.

Before CERCONE, President Judge, and PRICE, SPAETH, HESTER, CAVANAUGH, WICKERSHAM, BROSKY, WIEAND, JOHNSON, MONTEMURO, POPOVICH, DiSALLE and SHERTZ, JJ.

CERCONE, President Judge:

This appeal involves the question of whether or not a vendor of real estate is liable for failing to disclose his knowledge of a termite infestation to an unknowing purchaser.

In May of 1973, Eldred and Jean Frost, appellants herein, sold their residence to the appellees, Theodore and Joanne Quashnock. The appellants put their house up for sale because Mr. Frost was about to be transferred to a different location by his employer. The Quashnocks expressed an interest in purchasing the residence and asked to be the first to look at it. After examining the house one evening in May of 1973, the Quashnocks advised the Frosts on the next day that they had decided to purchase the property. The Frosts made no representations with respect to the presence of termites, nor did the Quashnocks specifically inquire as to

this fact. Moreover, two representatives of the bank which extended the mortgage to the Quashnocks inspected the house and they were neither informed of, nor did they independently discover, the termite infestation. The house was accordingly conveyed on May 28, 1973.

At trial, the Frosts themselves admitted that they had discovered the termite infestation in January of 1971. Around this time when a neighbor and friend, Mrs. Hughes, was visiting, Mrs. Frost showed her a baseboard in the livingroom which was eaten through. Also, there was sawdust on the floor, the rug was frayed, and the floor had weakened. A few weeks later, a termite exterminator was at the home of one of Mrs. Hughes' other neighbors. Mrs. Hughes asked him if he would take a look at Mrs. Frost's house to determine if she also had termites. When the exterminator agreed, he accompanied Mrs. Hughes to the Frost home, confirmed the fact that the house was, indeed, infested with termites, told them that the floor had weakened and showed them all of the places in the basement where the termites had left their mark. Although the exterminator offered his services, the Frosts declined to expend the sum of $240.00 to rectify the situation. Instead, they attempted to rid themselves of the pests by spreading powder in the basement area of their home. It was adduced at trial, however, that they knew this preventive action was not successful. Thus, the Frosts admit that they were aware of the termite infestation at the time of the sale.

In January of 1977, as Mr. Quashnock came up the back stairs of the house, he noticed that some paint chips had fallen from the back of a step. When he looked more closely he saw grooves in the wood underneath where the paint had been. The very next day, Mrs. Quashnock had her son remove some old wood that was in the crawl space of the home adjacent to the regular basement. This dirt bottomed area was located under the dining room of the house and access was gained from the basement through a small window on hinges. When they attempted to saw the wood into smaller pieces to burn in the fireplace, the Quashnocks

discovered that it was eaten through and that there were "all kinds of grooves" in it. After calling an expert to confirm their suspicion that the dwelling was infested by termites, the Quashnocks arranged to have the place exterminated at the earliest feasible time. This, however, could not be done properly until springtime when the ground had thawed. Sometime thereafter, the task was completed and the Quashnocks undertook to repair the damaged areas.

After the Quashnocks discovered the infestation, but before the actual extermination, Mrs. Hughes was visiting with Mrs. Quashnock for the first time. When Mrs. Quashnock mentioned that they were going to have the house exterminated for ants, Mrs. Hughes indicated that there were more than ants and proceeded to show Mrs. Quashnock the crawl space, the sills, the beams and all of the other areas in the basement which the exterminator had previously indicated were infested with termites. Mrs. Hughes testified at trial that the exterminator had informed her and Mrs. Frost that the "mud channels" which were present on the beams in the basement were one of the visible signs of termites being present. However, when Mrs. Hughes went to show Mrs. Quashnock where these mud channels were, she discovered that the channels had been scraped down and the basement painted. The Frosts admit that they painted the basement but claim that the beams were not painted and that, in any event, their motive was not to conceal. Nevertheless, Mr. Beish, an expert produced by the Quashnocks testified that painting the beams would cover the mud channels and cause them to cave in, thus making them hard to detect:

## REDIRECT EXAMINATION

BY [PLAINTIFFS' ATTORNEY]:

Q. Mr. Beish, I have just a couple questions. There was some talk in Cross-Examination about mud channels and paint. All right. What effect would painting have with mud channels, or on the mud channels?

A. It covers them up and also caves [them] in. Once they are caved in and covered up like that, normally the termite will go in another direction because they have caved in their access area and go to another area that is darker. And they won't come back.

They don't like to surface. When they surface they build them [sic] mud channels. Once you knock the channels off and paint over, there is something about the pigment in the paint they don't care for. They seem to go in another direction. They can still come back out on the paint, not normally, but they can.

Q. Did they in this case?

A. When I seen [sic] the area they was [sic] back out on it at the time, this was back when I inspected it.

Q. Okay, did the paint—would painting have any—

A. If you are asking about killing power, no.

Q. No, would it conceal the presence of termites?

A. For a limited time. Just like anything else. If you have an old rusted car, paint over it, looks good for a while.

Q. It would for a time being.

A. Yes, it would just be a matter of time before—

Q. Until they—

A. After some swarm they come right back out again.

[PLAINTIFFS' ATTORNEY]: I have no further questions.

## RECROSS EXAMINATION

BY [DEFENDANTS' ATTORNEY]

Q. *Mr. Beish, you say the average person does not recognize mud channels as being [evidence of the presence of] termites.*

A. *That is correct.*

Q. *They just think some mud [is] on the beam, is that correct?*

A. *That is correct,* because it can come in different sizes.

Q. Pardon me?

A. I say, that is correct, because it can come in different sizes.

Q. And how long would paint conceal the termite[s], for example?

A. That is another hard question, that depends on how bad your infestation is in the area you paint. That could go for a couple years, three years, four years, or could even go a year and come back out.

The Quashnocks instituted this action in trespass in the Court of Common Pleas of Clearfield County claiming as damages the cost of exterminating and repairing their home. After a nonjury trial, the court held the Frosts liable and stated in its opinion:

In this case, the [Frosts] sold certain premises to the [Quashnocks] which they knew to be infested with termites, and although they did not actively conceal said infestation or certify to the nonexistence of said termites, nevertheless, the condition was such that to the casual inexperienced inspector their presence would not be revealed. This court is of the opinion that there was a duty in the sellers to disclose this condition to the buyers regardless of the buyers' failure to specifically inquire as to the existence of termites.

Damages were, therefore, awarded in the amount of $8,836.00, but were later reduced to $5,192.74 as a result of appellants' exceptions. This appeal followed.

In Pennsylvania, there is binding and persuasive authority which extends a seller's liability to a failure to disclose a termite infestation of which he has knowledge. *See Glanski v. Ervine*, 269 Pa.Superior Ct. 182, 409 A.2d 425 (1979). The dissenting opinion herein characterizes the *Glanski* decision as one involving material misrepresentation, and so distinguishes the case from the instant matter. This reading by the dissent, however, is only partially correct. In *Glanski* there were two defendants: (1) the real estate broker who misrepresented the true facts, and (2) the silent seller of the

house.[1] Clearly, the broker, Graff, was held liable due to his misrepresentations. However, the *silent* seller of the property, Ervine, was also held responsible for his failure to disclose. With regard to the seller's liability, the *Glanski* court wrote:

> Here, there was sufficient evidence to support the verdict against appellant Ervine, for he admitted he had known about the termites. A seller has a duty to disclose conditions that are dangerous to the purchaser. *Shane v. Hoffman, supra* [227 Pa.Superior Ct. 176, 324 A.2d 532]; Restatement, Torts (Second), § 353. In particular, a seller must disclose a termite infestation. *DeJoseph v. Zambelli,* 392 Pa. 24, 139 A.2d 644 (1958) (per curiam affirmance of finding of liability of seller who did not disclose termite infestation); *Shane v. Hoffman, supra* (citing *DeJoseph v. Zambelli, supra*).

269 Pa.Superior Ct. at 191–92, 409 A.2d at 430.

The *Glanski* decision cited *Shane v. Hoffman,* 227 Pa.Superior Ct. 176, 324 A.2d 532 (1974) and *DeJoseph v. Zambelli,* 11 D.&C.2d 447 (1957) *aff'd per curiam* 392 Pa. 24, 139 A.2d 644 (1958) as authority for its holding. It is true that those cases factually involved acts of concealment or material misrepresentations. Nevertheless, the general principle of law which the *Glanski* court gleaned from those cases is accurate and the factual differences are of no import with respect to the applicability of the general rule requiring disclosure.[2] In *DeJoseph* it was stated:

1. In fact, the seller therein directed the broker to inform potential buyers of the termite infestation. Instead, the broker told the buyers not to converse with the seller concerning the sale of the house as he was a little eccentric! Nevertheless, the *silent* seller was held liable on those facts which makes the argument *a fortiori* in the instant case.

2. In *O'Callahan v. Weitzman,* 291 Pa.Superior Ct. 471, 475, 436 A.2d 212, 214 (1981), Judge Hoffman, writing for a panel of this Court which included Judges Spaeth and Brosky, articulated a time tested general principle of law with respect to nondisclosure as it arose in a different context: "It is well settled that 'the deliberate nondisclosure of a material fact amounts to a culpable misrepresentation no less than does an intentional affirmation of a material falsity.' *Neuman*

> Where a party is induced to enter into a transaction with another by means of the latter's fraud or material misrepresentation, such a transaction can be avoided by the innocent party. Fraud arises where the misrepresentation is knowingly false, where there is any intentional concealment calculated to deceive or where there is a nonprivileged failure to disclose.

*Id.* at 452. *See also Clarke v. Assurance Co.*, 146 Pa. 561, 23 A. 248 (1892) (per curiam decisions have the binding force and effect of law).

Likewise, the *Shane v. Hoffman* decision quoted similar language to the effect that "... fraud consists in anything calculated to deceive, whether by single act or combination, or by suppression of truth, or a suggestion of what is false, whether it be direct falsehood or by innuendo, *by speech or silence*, word of mouth, or look or gesture. It is any artifice by which a person is deceived to his disadvantage." 227 Pa.Superior Ct. at 181–82, 324 A.2d at 536. (Emphasis added) (quoting *McClellan Estate*, 365 Pa. 401, 407, 75 A.2d 595, 598 (1950). Moreover, in *Shane*, this court held the vendor liable not only on principles of *respondeat superior* but also because she was a *silent* seller who breached a duty to disclose:

> ... [I]n response to a question at the closing concerning the draining capacity throughout the house, [the seller] said nothing about a problem, which ... was known to exist. While mere silence is not usually actionable, and while the doctrine of *caveat emptor* may sometimes apply to prevent action on an undisclosed problem existing at the time of a sale or transaction, such is not the case where the law recognizes a duty to disclose.

> . . . . .

> *v. Corn Exchange National Bank & Trust Co.*, 356 Pa. 442, 451, 51 A.2d 759, 764 (1947)."

... In this jurisdiction, the courts have long recognized a duty to disclose conditions which are dangerous to the purchaser or other persons using the property of another. 227 Pa.Superior Ct. at 184–85, 324 A.2d at 537–38.

Therefore, while *DeJoseph* and *Shane* may be read narrowly as being factually distinguishable from *Glanski* and the case at hand, the general principles of law they articulated are equally applicable to both factual scenarios. Regardless of *DeJoseph* and *Shane*, however, the question presented in this appeal was squarely presented and determined in the purchaser's favor by this Court in *Glanski*. Thus, there is Pennsylvania authority directly on point that a seller has an affirmative duty to disclose a termite infestation of which he has knowledge. *See* Annotation, 22 A.L.R.3d 972 (Supp. 1981) (citing *Glanski* in support of the proposition that Pennsylvania subscribes to the view that a duty to disclose exists).

In seeking enlightenment from other jurisdictions, one will uncover two opposing views in the area of nondisclosure. Absent active concealment or material misrepresentations, the traditional view holds that there is no duty to disclose no matter how unfair—*caveat emptor. See Swinton v. Whitinsville Sav. Bank*, 311 Mass. 677, 42 N.E.2d 808 (1942); *Fegeas v. Sherrill*, 218 Md. 472, 147 A.2d 223 (1958); *Hendrick v. Lynn*, 37 Del.Ch. 402, 144 A.2d 147 (1958). The modern view,[3] however, holds that where there is a serious

---

**3.** *See* Prosser, Law of Torts, § 106 at 697–98 (4th ed. 1971) (footnotes omitted):

[T]here has been a rather amorphous tendency on the part of most courts to find a duty of disclosure in cases where the defendant has special knowledge, or means of knowledge, not open to the plaintiff, and is aware that the plaintiff is acting under a misapprehension as to facts which would be of importance to him, and would probably affect his decision. This tendency, which has gone far to whittle away the "general rule," has been most manifest in cases involving latent dangerous physical conditions of land or chattels, or defects in the title where the plaintiff has acted upon the reasonable assumption that such conditions do not exist. This has now generally been extended to any facts or conditions basic to the transaction, even though they are of a kind likely to cause only pecuniary loss. Thus when the seller of a house fails to disclose to

and dangerous [4] latent [5] defect known to exist by the seller [6], then he must disclose such defect to the unknowing buyer or

> the buyer the fact that it is infested with termites, or built on improperly compacted filled ground, the modern law is definitely that he will be liable for the pecuniary loss sustained...
>
> ... The law appears to be working toward the ultimate conclusion that full disclosure of all material facts must be made whenever elementary fair conduct demands it.

4. It is important to remember that the defect has to be dangerous in order for the duty of disclosure to exist. For example, termite infestations are dangerous because the structural soundness of the building is affected. *See Obde v. Schlemeyer,* 56 Wash.2d 449, 353 P.2d 672 (1960). Roach infestations and defective waterwells are not. *See Weintraub v. Krobatsch,* 64 N.J. 445, 317 A.2d 68 (1974) (roach case); *Klott v. Associates Real Estate,* 41 Ohio App.2d 118, 322 N.E.2d 690 (1974) (waterwell case).

    It should be noted that in the instant case supporting beams had been eaten away and that the floor had weakened.

5. In 37 Am.Jur.2d *Fraud and Deceit* § 158 (1968), it was stated that:

> when there exists in the property which is the subject of a sale latent defects or hidden conditions *not discoverable on a reasonable examination* of the property, the seller, if he has knowledge thereof, is bound to disclose such latent defects or conditions to the buyer, and his failure to do so may be made the basis of a charge of fraud. (Emphasis added).

    Thus, if the condition is readily ascertainable upon a reasonable examination, then the seller is not under a duty to disclose. This was, in fact, the situation in *Harrison v. Welsh,* 295 Pa. 501, 145 A. 507 (1929) where the Supreme Court stated:

> Ordinarily, the seller is not obliged to disclose facts of which he is aware when the vendee can in the exercise of his ordinary activities, discover the truth for himself, though he is responsible for loss if shown guilty of fraud or intentional concealment of essential matters: *Rothermel v. Phillips,* 292 Pa. 371, 141 A. 241.

    Although the Court there recognized a vendor's duty to disclose latent defects that concern "essential matters," no liability was found because the court determined that the true facts about the stock transaction in question could have been easily ascertained by the plaintiff in that case through a reasonable investigation of the market with which the plaintiff was familiar. Likewise, *Ray et ux. v. Montgomery, et al.,* Ala., 399 So.2d 230 (1980), is similar in this respect because in that case there was no inspection made and the termite damage therein would easily have been discovered with ordinary diligence.

6. In *Hughes v. Stusser,* 68 Wash.2d 707, 415 P.2d 89 (1966), the silent seller was not held liable only because the trial judge made a factual finding that the seller did not know of the termite's presence at the property in question. *Cf. Pywell v. Haldane,* D.C.Mun.App., 186 A.2d 623 (1962).

suffer liability for his failure to do so. *See Miles v. McSwegin*, 58 Ohio St.2d 97, 388 N.E.2d 1367 (1979); *Cohen v. Blessing*, 259 S.C. 400, 192 S.E.2d 204 (1972); *Obde v. Schlemeyer*, 56 Wash.2d 449, 353 P.2d 672 (1960). *See also* note 8 *supra*. Thus, the state of law can be adequately summarized as follows:

Although it is generally recognized that termite infestation of real estate materially reduces its value, the courts are divided as to the duty of the vendor to give the purchaser information as to the infestation. Thus, it has been held that unless the vendor stands in a fiduciary or other similar relation of trust with respect to the purchaser or the sale is not one at arm's length, he has no duty to disclose termite infestation in the real estate sold. In support of this rule, it has been said that the law has not yet reached the point of imposing upon the frailties of human nature a standard so idealistic as to hold every seller liable who fails to disclose any nonapparent defect known to him in the subject of sale which materially reduces its value and which the buyer fails to discover. In a few recent decisions, however, the courts held that termite infestation can obviously become a serious and dangerous condition and, if known to the vendor, must in good faith be disclosed to the purchaser, since caveat emptor is no longer rigidly applied to the complete exclusion of any moral or legal obligation to disclose material facts not readily observable upon reasonable inspection by the purchaser, and that the object of the law is to impose on parties to the transaction a duty to speak whenever justice, equity, and fair dealing demand it.

Annotation, 22 A.L.R.3d 972, 975 (1968) (footnotes omitted).

The modern judicial trend is away from a strict application of the *caveat emptor* doctrine and towards the more fair and equitable doctrine requiring disclosure of latent defects which are of a serious and dangerous nature:

It is of course apparent that the content of the maxim 'caveat emptor', used in its broader meaning of imposing risks on both parties to a transaction, has been greatly

limited since its origin. When Lord Cairns stated in *Peek v. Gurney* that there was no duty to disclose facts, however morally censurable their non-disclosure may be, he was stating the law as shaped by an individualistic philosophy based upon freedom of contract. It was not concerned with the morals. In the present stage of the law, the decisions show a drawing away from this idea, and there can be seen an attempt by many courts to reach a just result in so far as possible, but yet maintaining the degree of certainty which the law must have. The statement may often be found that if either party to a contract of sale conceals or suppresses a material fact which he is in good faith bound to disclose then his silence is fraudulent.

The attitude of the courts toward non-disclosure is undergoing a change and contrary to Lord Cairns' famous remark it would seem that the object of the law in these cases should be to impose on parties to the transaction a duty to speak whenever justice, equity, and fair dealing demand it.

Keeton, *Fraud—Concealment and Non-Disclosure*, 15 Tex.L. Rev. 1, 31 (1936).

In *Obde v. Schlemeyer, supra,* the Supreme Court of Washington State quoted the above passage with approval and made a pertinent comparison to that state's modernized landlord-tenant law which holds a landlord liable for failing to disclose concealed defects known to him at the time the lease is made, and dangerous to the unknowing tenant. 56 Wash.2d at 451–53, 353 P.2d at 674–75 (quoting *Perkins v. Marsh,* 179 Wash. 362, 37 P.2d 689 (1934)[7]). The court deemed this rule to be equally applicable in the vendor-vendee situation. Bringing this comparison home to Pennsylvania law, it is apparent that our recent developments in

7. Where there are concealed defects in demised premises, dangerous to the property, health, or life of the tenant, which defects are known to the landlord when the lease is made, but unknown to the tenant, and which a careful examination on his part would not disclose, it is the landlord's duty to disclose them to the tenant before leasing, and his failure to do so amounts to a fraud. 179 Wash. at 365, 37 P.2d at 690.

the landlord-tenant area would dictate a more modern and equitable approach than that of *caveat emptor. See, e.g., Pugh v. Holmes,* 253 Pa.Superior Ct. 76, 384 A.2d 1234 (1978) *aff'd* 486 Pa. 272, 405 A.2d 897 (1979).

The dissenters to our opinion today would not hold the sellers liable because they do not view the defect in the instant case as a latent one. In support of this conclusion it is argued that the termite infestation was readily apparent in the crawl space of the house. The record, however, does not bear this out. Mrs. Frost herself admitted at trial that the condition was "not readily noticeable." Also, Mr. Beish, the expert who testified in this regard, indicated that even if the Quashnocks had seen the mud channels in the crawl space, they nevertheless would not have known what they were:

## CROSS EXAMINATION

BY [DEFENDANTS' ATTORNEY]:

Q. Mr. Beish, you are saying if I gather what you are saying, it is very difficult for a layman to ascertain whether a home is infested with termites, is that correct?

A. The average person, yes, that is correct.

.        .        .        .        .

Q. What I'm saying is a person looking at a home, a person looking at a home in order to—you have been here when Mrs. Quashnock testified.

A. Yes, I was here.

Q. And you heard the examination she made of the home.

A. Right.

Q. That type of examination would be very difficult for her to ascertain termites.

A. Yes, sir, unless she would see damage in the crawl space.

Q. Unless she would have gone into the crawl space, otherwise she wouldn't have seen it.

A. *Yes, she could see it, but she wouldn't know what she was looking at.*

Thus, the channels were not readily seen in the basement due in no small part to appellants' recent painting of that area, and, although the channels were more visible in the crawl space, an ordinary inexperienced person would, nevertheless, not have recognized them as signaling a termite infestation.

Moreover, there also was testimony that Mr. Frost himself had never gone into the crawl space even after he discovered he had termites, that he did not think he could fit into the 12″ × 24″ opening which was approximately three to four feet off of the basement floor, and that the crawl space was closed off by a hinged window, dark and without its own source of light. It is, therefore, our opinion that a "reasonable inspection" of the house by prospective buyers would not require investigation of this particular area of the basement, and the testimony of the expert at trial was clear that any other evidence of termite infestation would not have been readily apparent to an untrained observer of the basement or the rest of the house. Also, it is interesting to note that the infestation was not discovered by the Frosts until after they resided in the house for four years. Nor was it discovered by the Quashnocks until after they resided there for three years and nine months. Nor was it discovered by the two individuals who inspected the property for the bank which financed the Quashnock's purchase. Thus, on this record we are not inclined to hold that the condition of the house at the time of the sale was such that the infestation would have been discovered upon a reasonable inspection.

More importantly, however, the findings of fact made by the trial judge as evidenced by his written opinion, which was quoted in pertinent part at the outset of this opinion, indicate that the termite infestation would not have been ascertainable by an untrained buyer. Thus, the court below found that the defect was latent and this factual determination should not be disturbed on appeal since it is supported by competent evidence in the record. *See First Pennsylva-*

*nia Banking and Trust Co. v. Liberati*, 282 Pa.Superior Ct. 198, 422 A.2d 1074 (1980); *Denby v. North Side Carpet Cleaning Co.*, 257 Pa.Superior Ct. 73, 390 A.2d 252 (1978); *Courts v. Campbell*, 245 Pa.Superior Ct. 326, 369 A.2d 425 (1976). *See also Stauffer v. Stauffer*, 465 Pa. 558, 351 A.2d 236 (1976). To permit an appellate court to sift through notes of testimony and make its own independent factual determinations is against our basic notions of appellate review, and would lead to chaos and confusion. For instance, in the present case, one could easily find support in the record for the factual determination that the sellers actively concealed the termite infestation by scraping and painting the beams in the basement. The lower court, however, made a contrary finding based on competent evidence and this determination likewise should not be disturbed on appeal. Therefore, while the facts of this case do not consist of either active concealment or material misrepresentations, they do involve nondisclosure of a serious and dangerous *latent* defect. As such, application of the modern view as articulated in the *Glanski* decision would render the Frosts liable for failing to disclose the presence of termites to the unknowing buyers, the Quashnocks.

In conclusion, a termite infestation of a residential house is manifestly a serious and dangerous condition and where as here, its existence is not readily observable upon reasonable inspection, then justice, equity, and fair dealing require the vendor to speak regardless of the buyer's failure to inquire of the possibility that termites are present. *Obde v. Schlemeyer*, 56 Wash.2d at 452, 353 P.2d at 675. Therefore, if there were no precedent on the topic, the courts of this Commonwealth would do well to follow the modern trend espoused by the "better reasoned recent decisions." *Cohen v. Blessing*, 259 S.C. at 403, 192 S.E.2d at 205–06.[8] In point of fact, however, this Court has already adopted the modern view in

8. The *Cohen* case cited and quoted 37 Am.Jur.2d, *Fraud and Deceit* § 158 (1968) (quoted in note 9 herein, *infra*) and Annotation, 22 A.L.R.3d 972, § 3 at 977 (1968) (quoted in text herein, *supra*) in support of its conclusion to follow "the better reasoned recent decisions" which adopt the modern view).

the case of *Glanski v. Ervine, supra*. Due to principles of *stare decisis*, therefore, we are constrained to follow the recent and persuasive Pennsylvania authority which is directly on point.

For all of the foregoing reasons, the judgment of $5,192.74 in favor of the buyers in the instant case is affirmed.

SPAETH, J., files a concurring opinion.

JOHNSON, J., files a dissenting opinion in which PRICE, CAVANAUGH and POPOVICH, JJ., join.

BROSKY, J., files a dissenting opinion.

The case was decided prior to the expiration of commission of office of DiSALLE and SHERTZ, JJ.

SPAETH, Judge, concurring:

I agree that the judgment should be affirmed, but I reach that conclusion by reasoning somewhat different from the majority's. Since the case is of more than usual importance, perhaps an alternative opinion regarding it may be of some value.

–1–

This case was neither pleaded nor tried as a case of unfair dealing but, rather, as a case of fraudulent concealment. As the majority opinion shows, fraud might have been found. But it was not. Having found no fraud, the lower court might have dismissed the case. Instead the court held that a case of unfair dealing had been proved.[1] The court said that as sellers the Frosts had "a duty . . . to disclose this condition [the termite infestation] to the buyers regardless of the buyers' failure to specifically inquire as to the existence of termites." In support of this conclusion the court cited Restatement (Second) of Torts, Section 353, and *Shane v. Hoffman*, 227 Pa.Superior Ct. 176, 324 A.2d 532 (1974).

Section 353 says that a vendor of land is "subject to liability . . . for physical harm caused by" an undisclosed

---

1. The Frosts did not except to the court's thus, in effect, treating the complaint as though amended to conform the allegata to the probata.

condition that "involves unreasonable risk to persons on the land." It is arguable that "physical harm" means that someone suffered personal injury.[2] That would mean that even if the floors of a house were so infested with termites as to be unsafe to walk on, the vendor would not be liable under Section 353 unless some one walked on the floors, fell through, and was hurt.

I believe, however, that in imposing "liability" for failure to disclose a dangerous condition, Section 353 implies a "duty." In the case I have just supposed, therefore, I should require the vendor to pay for repairs to the floors. This conclusion is supported by what we did in *Shane*. There the undisclosed dangerous condition was not termite-infested floors but a blocked sewer. We held that the vendor had a duty "to disclose any dangerous condition to life, limb or to the general health or safety of the purchaser and his family." 227 Pa.Superior Ct. at 185, 324 A.2d at 538. We did not require proof that the undisclosed danger had resulted in personal injury to the purchaser or a member of his family. It was enough that injury was threatened. (The purchaser's baby was not hurt; that was avoided by keeping the baby out of the house while the sewer was fixed. *Id.*, 227 Pa.Super.Ct. at 186, 324 A.2d at 538.) We therefore affirmed a judgment requiring the vendor to pay for repairs to the sewer. We noted that the vendor's duty to disclose was "evident, either by reason of the Restatement Rule [Section 353] or by well-settled common law principles." *Id.*

In *Century Display Manufacturing Corp. v. D. R. Wager Construction Co., Inc.*, 71 Ill.2d 428, 376 N.E.2d 993, 17 Ill.Dec. 664 (1978), the Supreme Court of Illinois also concluded that Section 353 was not limited to cases of personal injury. There, United States Steel Corporation sold a plant to Century Display Manufacturing Corporation. A fire broke out in the plant. Century claimed that the fire was caused by flammable liquid left in the plant's tanks and pipes. United States Steel argued that recovery for the fire

2. In his dissent Judge JOHNSON seems to accept this argument. At 133, n. 2. The majority does not consider it.

damage was not authorized by Section 353 because, it said, Section 353 "refers solely to recovery for personal injuries." 71 Ill.2d at 434, 376 N.E.2d at 996, 17 Ill.Dec. at 667. The Supreme Court rejected this argument:

Although the overwhelming majority of cases in this area of tort liability concern themselves with recovery for damages incurred as a result of bodily injury (see Annot., 8 A.L.R.2d 218 (1949); Annot., 48 A.L.R.2d 1027 (1973); 65 C.J.S. *Negligence* 93 (1966)), it is clear that the term "physical harm," as used in section 353, encompasses damages to tangible property as well as injuries to the person. 71 Ill.2d at 434, 376 N.E.2d at 996, 17 Ill.Dec. at 667.

Even so, I think Section 353 and *Shane* do not support the lower court's decision. For while the evidence showed that there had been "physical harm caused by" the undisclosed condition—the termite infestation—it did not show that the condition "involve[d] unreasonable risk to persons on the land." When the house was sold, the infestation was limited. After several years the infestation became more extensive. It is true, as the majority notes, that "supporting beams had been eaten away and . . . the floor had weakened." At 125 n. 4. But still, it does not appear that there was a "dangerous condition to life, limb or to the general health or safety" of the Quashnocks.

–2–

When the lower court's reasoning does not support its decision, we may still affirm if we are led to the same decision by another line of reasoning. *E. J. McAleer & Co., Inc. v. Iceland Products, Inc.*, 475 Pa. 610, 381 A.2d 441 (1977); *Sones v. Aetna Cas. and Sur. Co.*, 270 Pa.Superior Ct. 330, 411 A.2d 552 (1979). Here, I find such another line of reasoning in Restatement (Second) of Torts, Section 551, which says that a party to a business transaction has a duty to disclose

facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the others, because of the relationship between them, the

customs of the trade or other objective circumstances, would reasonably expect a disclosure of these facts.

The authors of Section 551 anticipated that it might support a recovery for termite infestation. Their third illustration to the section is:

3. A sells to B a dwelling house, without disclosing to B the fact that the house is riddled with termites. This is a fact basic to the transaction.

This illustration, however, is not dispositive. If the house is "riddled" *enough* there may be an unreasonable risk of physical harm, so that recovery may be had under Section 353. Therefore, the question we must decide is, when the house is not *that* riddled, as here it was not, may recovery nevertheless be had under Section 551?

There is no clear answer to this question. As the Comment to Section 551 notes, a balance must be struck. On the one hand:

To a considerable extent, sanctioned by the customs and mores of the community, superior information and better business acumen are legitimate advantages, which lead to no liability. The defendant may reasonably expect the plaintiff to make his own investigation, draw his own conclusions and protect himself; and if the plaintiff is indolent, inexperienced or ignorant, or his judgment is bad, or he does not have access to adequate information, the defendant is under no obligation to make good his deficiencies.

Comment, para. k.

On the other hand:

The continuing development of modern business ethics has, however, limited to some extent this privilege to take advantage of ignorance. There are situations in which the defendant not only knows that his bargaining adversary is acting under a mistake basic to the transaction, but also knows that his adversary, by reason of the relations between them, the customs of the trade, or other objective circumstances, is reasonably relying upon a disclosure of

the unrevealed fact if it exists. In this type of case good faith and fair dealing may require a disclosure.

Comment, para. 1.

None of the other opinions that have been filed in this case cites Section 551.[3] Implicitly, however, each of them engages in the process of striking a balance of the conflicting considerations identified in the Comment to the section. Judge BROSKY, and Judge JOHNSON, in separate dissents, strike the balance in favor of the Frosts; the majority strikes it in favor of the Quashnocks.[4] I too strike it in favor of the Quashnocks.

Judge BROSKY and Judge JOHNSON both suggest—or so it seems to me—that because the lower court found that the Frosts were not guilty of *fraudulent concealment*, it follows that they were not guilty of *bad faith*. Thus Judge BROSKY says that the Frosts "did not think the problem was a serious one," at 132, and Judge JOHNSON, that they "had good reason to believe that the termites had not created a serious problem," at 135. While thus excusing the Frosts' failure to disclose the termite infestation, both judges fault the Quashnocks for their failure to discover the infestation, Judge BROSKY saying that the Quashnocks "were given ample opportunity to inspect the house," at 132,

**3.** The majority opinion cites other authority that is to the same effect. *See* at 125 n. 3., citing Prosser's statement that "[t]he law appears to be working toward the ultimate conclusion that full disclosure of all material facts must be made whenever elementary fair conduct demands it." Prosser, Law of Torts, § 106 (4th ed. 1971). *See also* the majority opinion's citation of Keeton, *Fraud— Concealment and Non-Disclosure*, 15 Tex.L.Rev. 1 (1936). At 126.

**4.** The majority engages in this balancing process only as an alternative basis of its decision, and in the second half of its opinion. At 125 *et seq.* In the first half of its opinion the majority states that this case is controlled by *Glanski v. Ervine*, 269 Pa.Superior Ct. 182, 409 A.2d 425 (1979), which the majority summarizes as holding that "a seller has an affirmative duty to disclose a [latent] termite infestation of which he has knowledge." At 124. I acknowledge that *Glanski* contains language that supports this reading of it. It was, however, a case of fraudulent concealment, and I think should be read in that light. I therefore agree with Judge JOHNSON that our decision here is not controlled by *Glanski*, and may be seen as going beyond it. I am entirely persuaded, however, that we should go beyond *Glanski*.

and Judge JOHNSON, that they "neither utilized the opportunity to discover the termites in the crawl space, nor did they even inquire about termites," at 136 (footnote omitted).

If nothing else, this case illustrates how reasonable men may differ. It seems clear to me, however, that a party not guilty of fraudulent concealment may nevertheless have engaged in bad faith dealing. I do not see how it can be maintained that the Frosts were acting in *good* faith, or that they engaged in *fair* dealing. They knew their house was infested with termites, and they also knew that the Quashnocks did not know it was. In deciding whether some one has engaged in "good faith and fair dealing," Restatement (Second) of Torts, Section 551, Comment 1, we must ask ourselves, What sort of society do we want? The doctrine of *caveat emptor* answers this question by saying that we want a society of individuals dealing with each other as adversaries, each pushing his advantage, or supposed advantage, over the other as far as he can. The idea is that we will go farthest, both as individuals and as a society, if we compete with each other. Of course there is a good deal to this. But winning is not everything. And the law should not say it is. It may be granted that the law should not try to require too high a standard of conduct, for that would assume that we are better persons than we really are. But it does not follow that the law should be satisfied with saying, You can do anything so long as you don't actually cheat. That gives too much play to selfishness, and surrenders too easily the advantages to be gained from cooperation.

Here, I submit, to excuse the Frosts' conduct would represent just such a surrender. It is very little to require of an individual that he disclose a termite infestation *that he knows exists.* Furthermore, by requiring disclosure, a great deal may be gained. Here, with disclosure, the infestation could have been eliminated at the cost of a few hundred dollars. To excuse non-disclosure would countenance unnecessary waste. The Frosts must have known, especially after they consulted an exterminator, that if they did not disclose the infestation it would become more extensive. That is

what termites do: they burrow unseen. To hold that disclosure was not required would be the same as saying that enabling the Frosts to profit by a few hundred dollars was more important than avoiding the waste of the five thousand dollars that the Quashnocks had to spend to eliminate the infestation, when they finally found it.

I concur in the order affirming the judgment.

BROSKY, Judge, dissenting:

I am in complete agreement with the majority's interpretation of the applicable law, however, I am not persuaded that the facts in the instant case, when applied to that law, justify the result reached by the majority. I find the following facts to be of critical importance:

1. In 1971 the Frosts were informed that their house had termites present in it, however, the problem was not considered sufficiently serious by them to warrant spending $240 for an extermination.

2. The house was not sold by the Frosts to the Quashnocks until May, 1973, two years later.

3. The Quashnocks were given ample opportunity to inspect the house.

4. The Frosts were never asked by the Quashnocks whether a termite problem existed. The Frosts never stated to the Quashnocks that a termite problem did or did not exist.

5. The Quashnocks never undertook to have the house inspected for termites by an exterminator before they purchased the house or shortly thereafter.

6. The Quashnocks did not discover the termites until January of 1977.

7. The trial court held that the Frosts had not committed fraud in their representations to the Quashnocks concerning the condition of the house.

I would not hold, in light of these facts that the Frosts were under a duty to disclose to the Quashnocks anything about the termite condition, because the Frosts did not have

the requisite knowledge of the condition. *Glanski v. Ervine*, 269 Pa.Super. 182, 409 A.2d 425 (1979). Certainly, the Frosts knew there were termites in the house, however, they apparently did not know the extent of the problem. They had no reason to believe that the condition was dangerous to the purchaser. Clearly, they did not think the problem was a serious one. They took no action to remedy it two years before the sale was made. As the trial court determined, the Frosts did not present fraudulent representations to the Quashnocks. Furthermore, the Quashnocks were given ample opportunity to inspect the house. They did not find any fault with the house upon inspection. In fact, their discovery of the termite infestation did not occur until three years and eight months after they purchased the house. Consequently, I cannot agree with the majority that these facts justify holding that the Frosts were under a duty to disclose to the Quashnocks their knowledge of the presence of termites in the house years before the sale.

JOHNSON, Judge, dissenting:

The majority today holds that a seller of residential real estate has an affirmative duty to disclose a known termite infestation, even where the seller neither attempts to conceal the presence of termites nor realizes the serious consequences which might result from failure to treat the termite presence. Since I view this holding as constituting an extension of the law of this Commonwealth, and since I cannot agree that the facts in the instant case justify such an extension, I must respectfully dissent.

President Judge CERCONE, writing for the majority, holds, first, that, considering the facts of the instant case, it should be the means to establish the principle requiring disclosure of a known termite infestation, and second, that it is unnecessary to establish this principle because *Glanski v. Ervine*, 269 Pa.Super.Ct. 182, 409 A.2d 425 (1979), already established this legal precedent that is applicable to the instant case. A brief review of prior cases reveals that the instant case can be clearly distinguished from the cases which the majority cites as precedent.

I. *Pennsylvania Cases*

In addition to *Glanski v. Ervine*, the majority cites *Shane v. Hoffman*, 227 Pa.Super.Ct. 176, 324 A.2d 532 (1974) and *DeJoseph v. Zambelli*, 392 Pa. 24, 139 A.2d 644 (1958), to support its holding that the vendors had a duty to inform the purchasers of the termite infestation. These cases are clearly distinguishable from the instant case.

*DeJoseph* involved a vendor's fraudulent misrepresentation in response to the purchasers' question concerning the condition of the house. The vendors had whitewashed the basement and nailed boards over the joists to conceal the serious damage caused by termites. The joists could easily be penetrated by a pointed object, and some disintegrated when touched with a bare hand. Testimony from former tenants revealed that termites had crawled in their food and clothing. The condition was so hazardous that the Township Superintendent of Building Regulations declared that the first floor was unsafe and dangerous for human occupancy.

Presented with this factual situation, the Pennsylvania Supreme Court affirmed the chancellor's finding that the vendors had engaged in fraudulent concealment and material misrepresentations. The following was one of the chancellor's conclusions of law, which the Supreme Court also affirmed: "The doctrine of caveat emptor is inapplicable *because defendants committed the frauds of concealment and material misrepresentations* and thereby prevented detection of termite damage." [Emphasis added] 392 Pa. 24, 139 A.2d at 649.[1]

In *Shane v. Hoffman*, we held that the vendors were liable to the purchasers who had relied upon the vendors' fraudulent misrepresentations. In response to the purchasers' question concerning whether or not the sewer was in good working condition, the real estate agent replied that he knew of no problems. At the closing, the purchasers expressed concern to the vendor about the possibility of improper drainage. In reply, the vendor assured the purchas-

1. The official reporter does not reprint the chancellor's findings in this case.

ers that this was not a problem. Contrary to this assurance, only a month after the purchasers had moved into the property, the sewer backed up, flooding the basement with slime, human excrement, and bathroom tissue. The vendor knew of this condition, which had occurred on numerous occasions, and which had caused a former tenant to vacate the premises. The health hazard created by the backed-up sewer was so serious that the purchasers were required to keep their baby away from the premises for three months until the condition was rectified.

The *Shane* court held that the real estate agent was liable for his fraudulent reply to the purchasers' question concerning the condition of the sewer. The agent's reply was calculated to deceive the purchasers, the court held. The vendor's liability was based upon principles of agency law since the vendor authorized the agent to discuss all details relating to the property.

As a second basis for the vendor's liability, the court held that, because of the serious health hazard caused by the defective sewer, the vendor had a duty to inform the purchasers about this defect when they inquired about the drainage system. To support the imposition of this duty upon the vendor, the court cites section 353 of Restatement (Second) of Torts.[2]

The majority states that the vendor's liability in *Shane* was based upon the fact that, "she was a *silent* seller who breached a duty to disclose...." The majority then proceeds to quote from the *Shane* opinion which explained that, *in response to a question* concerning the drain, the vendor remained silent even though she knew both that a problem existed and that a prior tenant had vacated the premises because of the problem.

Two important distinctions must be made between *Shane* and the instant case. First, the vendor's deliberate silence *in response to the purchaser's question* in *Shane* must be distinguished from the silence of the vendors in the instant

---

2. By its terms, section 353 is limited to a vendor's liability for *physical harm* caused by the undisclosed condition.

case in which the purchasers did not make any inquiries. Second, the vendor in *Shane* knew that the drainage problem was a very serious one since a prior tenant had vacated the premises due to the sewer back-up. 227 Pa.Super.Ct. at 185–186, 324 A.2d at 538. Unlike the vendor in *Shane*, who knew of the serious sewer problem, the vendors in the instant case did not realize that the presence of termites could create a serious problem.[3] Considering these crucial distinctions, the principles of law articulated in *Shane* cannot control our decision in the instant case.

Like *DeJoseph* and *Shane, Borelli v. Barthel*, 205 Pa.Super.Ct. 442, 211 A.2d 11 (1965), also involved fraudulent misrepresentations by the vendors, who disguised termite damage with plasterboard and added three floor posts to compensate for termite damage to the joists.

In contrast with the instant case, *Borelli, DeJoseph*, and *Shane* involved fraud and/or misrepresentation by the vendor in response to the purchaser's questions. In the instant case, the purchasers did not inquire about termites, and the vendors made no attempt either to mislead the purchasers or to conceal any damage.

*Glanski v. Ervine*, 269 Pa.Super.Ct. 182, 409 A.2d 425 (1979), upon which the majority strongly relies, was also an action alleging fraud in the sale of a termite-infested house. In response to the purchaser's questions concerning the structural soundness of the house, the real estate agent repeatedly denied that any problems existed. In addition, the agent expressly denied that he had ever seen any termites on the premises. Because of a lack of proper lighting, and the placement of furniture to cover termite holes, the purchaser was unable to discover the termite infestation until after the closing. The purchaser then discovered that the house was structurally unsound and unfit for habitation.

On review, we held that the evidence supported verdicts against both the owner and his agent. The agent's liability was based upon his material misrepresentations concerning

---

**3.** See our discussion of the facts on pages 135 – 136, infra.

termites, upon which the purchaser justifiably relied to his detriment. 269 Pa.Super.Ct. at 193, 409 A.2d at 430.

Although the vendor in *Glanski* neither engaged in nor authorized any misrepresentations, our court held that the vendor had a duty to inform the purchaser about the termites because a seller must disclose conditions that are *dangerous* to the purchaser. 269 Pa.Super.Ct. at 191, 409 A.2d at 430. To support this principle, *Glanski* cites *Shane v. Hoffman* and section 353 of the Restatement (Second) of Torts.

The dangerous conditions in *Glanski*, which existed at the time of sale, clearly distinguish that case from the instant case. Our court's opinion related the dangerous conditions that Glanski discovered shortly after the closing:

Closing was held March 6, 1974.[3] Shortly thereafter, Glanski set up some lighting in the cellar and found that the beams were infested with termites. On the first floor, he discovered that termites had chewed a hole in the floor; until then, the hole had been covered by a large piece of Ervine's furniture. Door frames were found to have been eaten away, with only a shell of paint remaining. In short, the house was structurally unsound and unfit for habitation.

269 Pa.Super.Ct. at 187, 409 A.2d at 427 [footnote omitted].

Unlike *Glanski*, in the instant case, the presence of termites was not even detected until the purchasers had resided in the house for three (3) years and eight (8) months. Within this factual context, the termite infestation in the instant case did not constitute a condition that was "dangerous to the purchaser." Accordingly, under the holding in *Glanski*, the vendors in the instant case did not have a duty voluntarily to disclose the termite infestation.

In *Federal Land Bank of Baltimore v. Fetner*, 269 Pa.Super.Ct. 455, 410 A.2d 344 (1980), *cert. denied*, 446 U.S. 918, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980), we addressed the issue of whether or not, if neither concealment nor misrepresentations are involved, a vendor has a duty to disclose a title defect to the purchaser. Citing *American Metal Fabricators*

*Company v. Goldman,* 227 Pa.Super.Ct. 284, 323 A.2d 891 (1974), we held that,

> [a]n action based upon concealment will not lie, even as between a vendor and vendee, unless there is established an affirmative duty to disclose the existence of a title defect.

269 Pa.Super.Ct. at 462, 410 A.2d at 348.  The title defect in *Federal Land Bank* can be distinguished from the serious danger of physical harm that was involved in *Borelli, DeJoseph, Shane,* and *Glanski.*  In *Borelli, DeJoseph,* and *Glanski,* the damage by the termites was so severe that the houses were unfit for habitation.  The basement filled with human excrement in *Shane* certainly created a very serious health hazard to the occupants.  In the instant case, the damage caused by the termites was not even detected by Appellees until they had resided in the house for more than 3½ years.

The instant case involved neither a risk of immediate serious physical harm nor fraudulent misrepresentations, both of which were present in *Borelli, DeJoseph, Shane,* and *Glanski.*  Although the vendor in *Glanski* did not himself engage in fraudulent misrepresentations, the conditions in *Glanski* were very dangerous and the vendor knew of this danger.  In *Shane,* the vendor, who knew about the serious drainage problem, denied its existence in response to the purchaser's inquiry.  Since the instant case involves distinctions that cannot be reconciled with the respective facts in the aforesaid cases, these cases cannot provide precedent for the instant case.  Since the instant case involved neither a risk of immediate serious physical harm nor fraudulent misrepresentations, the principle of law approved by *Federal Land Bank* should govern the instant case, namely, that, absent an affirmative duty, the vendor need not disclose defects to the purchaser.

II.  *Facts Not Justification for Imposing Liability*

The majority asserts that the facts of the instant case would justify imposing liability upon the vendors if legal precedent establishing such liability did not already exist.  I must respectfully disagree.

As Judge BROSKY states in his Dissenting Opinion, the facts of the instant case do not justify imposing upon the vendors a duty to disclose. The vendors did not consider the problem to be sufficiently serious to spend $240.00 for extermination. After learning of the infestation, the vendors continued to live in the house for two (2) years; and they testified that they would not have moved if the husband's employer had not transferred him. The trial court found that the vendors made no attempt to conceal either the existence of the termites or the damage that the termites had caused. Thus, the facts of the instant case reveal that the vendors did not consider the termite infestation to be a serious problem.

The vendors had good reason to believe that the termites had not created a serious problem. Not only did the individuals who inspected the property for the bank fail to discover the termites, but the purchasers did not discover them until they had lived in the house for three (3) years and eight (8) months.

Although the majority interprets these facts to mean that the termite problem could not be discovered by a layman,[4] the importance of these facts is that they distinguish the termite infestation in the instant case from the serious and dangerous conditions in *DeJoseph v. Zambelli*, 392 Pa. 24, 139 A.2d 644 (1958), and *Glanski v. Ervine*, 269 Pa.Super.Ct. 182, 409 A.2d 425 (1979).

Also, the testimony revealed that the termites could have been detected by Appellees. A licensed exterminator testified that, although an untrained person would not have realized that the grooves in the basement were evidence of

4. The majority argues that the lower court's finding of fact should not be overturned on review. I agree. The problem is that the lower court's statement, that the termites would not have been ascertained by an untrained purchaser, is not a finding of fact but merely a statement of the judge's opinion in his memorandum opinion issued after exceptions were argued. The lower court did not even refer to this alleged "fact" in its opinion to support its decision following trial. Thus, rather than a finding of fact, the statement in question appears to be a mere afterthought of the lower court to support its denial of exceptions regarding the vendors' duty to disclose.

termites, a layman could detect the termites in the crawl space:

Q  Were these [grooves] readily seen?

A  I'll have to answer this way: to a man that is trained, yes; to somebody not trained, no.
*Now, in the crawl space that is a little different.* I'm talking about the big basement, you'd have to know what you were looking for to find it.

On cross-examination, the witness testified:

Q  And you heard the examination she [Mrs. Quashnock] made of the home.

A  Right.

Q  That type of examination would be very difficult for her to ascertain termites.

A  Yes, sir, *unless she would see damage in the crawl space.* [Emphasis added.]

Although Appellees admitted that they had ample time to inspect the premises, they neither utilized the opportunity to discover the termites in the crawl space, nor did they even inquire about termites.[5] Unlike the vendors in *DeJoseph, Shane,* and *Borelli,* the vendors in the instant case did not engage in any misrepresentations. The lower court held, as a finding of fact, that the vendors in the instant case did not

5.  The majority argues, first, that an inexperienced person would not have discovered the termites in the crawl space, and second, that a reasonable inspection would not include the crawl space because of its dimensions. I must disagree. As discussed above, the exterminator testified that a layman would have recognized the presence of termites in the crawl space. More significantly, when the Quashnocks pulled boards from the crawl space, they immediately saw the grooves and recognized that a problem existed. If they had inspected the crawl space before they purchased the house, they could have recognized the problem then.

In response to the majority's assertions about the dimensions of the crawl space, we note that, although Mr. Frost had never entered the crawl space, both the exterminator, called by the vendors, and a specialist, called by the purchasers to estimate the damage, had, in fact, entered it. Thus, the dimensions of the crawl space would not have prevented the purchasers from inspecting it. Mrs. Quashnock testified, however, that she had never even gone into the "back area" of the basement when she inspected the house. Surely this was not a "reasonable inspection" within this factual context.

engage in fraud. This case involves the mere failure to reveal when the purchasers neither inquired about termites nor adequately inspected the premises.

## CONCLUSION

The instant case presents this court with the difficult issue of where to draw the line between total mandatory disclosure—volunteering information when no questions have been asked—and a totally arms-length situation. I believe that the degree of severity of the infestation constitutes a reasonable restriction on the seller's liability. I believe, also, that the period of time that elapsed before the purchaser's discovery of the termites constitutes another restriction on the seller's liability. I am unable to conclude that a standard of strict liability is appropriate where, as here, the termite condition was neither serious nor dangerous at the time of sale.

The majority asserts that we need not establish precedent now because *Glanski* already established the law that is applicable to the instant case. The dangerous conditions in *Glanski*, together with the fact that the case involved fraudulent concealment, clearly distinguish *Glanski* from the instant case.

Since *Glanski* would not impose upon the vendors in the instant case a duty to disclose, I do not believe that the facts of the instant case are such that a duty to volunteer information should be imposed upon the vendors who neither attempted to conceal the presence of termites nor realized the serious consequences of the termites.

Considering the facts of the instant case—particularly, the purchasers' failure to inquire and to inspect, the length of time until the purchasers discovered the termites, and the vendors' apparent lack of knowledge that termites could create a serious problem—I would hold that Appellants did not have a duty to disclose the fact that termites were present in their residence.

The majority concedes that a defect must be both serious and dangerous before a duty to disclose arises. Within the

factual context of this case, I am unable to conclude that either requirement is clearly satisfied. I fear that the interpretation of the applicable law as contained in the majority opinion will result in new parameters of liability not envisioned by the court, which will not be conducive to the smooth and gradual development of our law. If the principle requiring disclosure of a known termite infestation is to be established, I submit that this case is not a proper vehicle for that important step.

I, therefore, would reverse the judgment in favor of the purchasers.

PRICE, CAVANAUGH and POPOVICH, JJ., join in this dissenting opinion.