In re HUMPHREY'S PEST CONTROL
COMPANY, INC., Debtor.

John MANES and Rosemarie
Manes, Plaintiffs,

v.

Margaret FRANCE, William C. Williams,
d/b/a William C. Williams Realty,
Steve Marcoe and Mary A. Scheuhing,
Esquire, Defendants.

Margaret FRANCE,
Third–Party Plaintiff,

v.

GLENSIDE, INC. t/a Humphrey's Pest
Control, Inc., Third–Party Defendant,
and Second Third–Party Plaintiff,

v.

James MELINSON, Trustee of Debtor,
Second Third–Party Defendant.

Bankruptcy No. 82–05539K.
Adv. No. 85–1069K.

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 10, 1987.

James J. Robinson, Philadelphia, Pa., for plaintiffs.

Thomas M. Guinan, Huntingdon Valley, Pa., for defendants/Williams and Marcoe.

Mary A. Scheuhing, Haverford, Pa., for defendants/France and Scheuhing.

David L. Narkiewicz, Philadelphia, Pa., for trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

This proceeding, which is present in our court due only to an unusual set of procedural circumstances, reveals, in the series of cross-claims filed, the very human tendency to blame third parties for situations which arise in large part from the attempts of persons to serve their own self-interests at the expense of concern for the consequences upon others. We conclude that the Plaintiff home purchasers are entitled to damages of $2,700.00 from the seller of the home and her daughter for the cost of making repairs to the roof of the premises due to the failure of the daughter to produce a roof certification, as was clearly required by the Agreement of Sale. We also hold that the buyers are entitled to damages of $2,696.00 from the seller and her daughter and from the seller's real estate broker due to the failure of these parties to disclose a report that termite infestation was found on the premises to the buyers. Finally, we hold that a company which produced a report, contrary to the undisclosed report, that no termite infesta-

tion was present is liable over to the seller's daughter and the broker for $672.00 of the termite-related damages awarded.

Had several of these parties not displayed some measure of opportunistic conduct on their own part, they would, in our eyes, have fared better. The buyers undermined their credibility that the termite damage was far more serious than we find it to be by refusing to open the walls to discover the actual damages thereto and by failing to disclose any of their claims in this lawsuit in a recent application to refinance the mortgage on their home. On the other hand, the seller's daughter and the broker could not in any manner justify their failure to disclose the unfavorable termite-inspection report to the buyers. The daughter enhanced her liability by refusing to be cooperative in resolving this matter with anyone. The rather apparent negligence of the second termite inspector was diminished in force by the failure of the seller's daughter to disclose the unfavorable report to him. We therefore consider our result equitable as well as supported by the relevant case law.

On May 2, 1985, the Plaintiffs, the buyers of a premises located at 2847 Winchester Avenue, Philadelphia, Pennsylvania 19136, (herein referred to as "the Premises"), JOHN AND ROSEMARIE MANES (herein referred to as "the Buyers"), filed this action at April Term, 1985, No. 6631, in the Court of Common Pleas of Philadelphia County. Originally named as Defendants were the late MARGARET FRANCE, the seller of the Premises to them (herein referred to as "the Seller"); WILLIAM C. WILLIAMS, the real estate broker in the sale (herein referred to as "the Broker"); and STEVEN MARCOE, the agent who initially procured the sale (herein referred to as "the Salesman," despite that he is a licensed broker in his own right). In their Answers, the Broker and the Salesman, represented by the same counsel, on one hand, and the Seller, on the other hand, asserted cross-claims against each other. The Seller also joined, as a third-party Defendant, GLENSIDE, INC., t/a HUMPHREY'S PEST CONTROL CO., INC. (herein referred to as "Glenside"), a corpo-

rate entity which had purchased the assets of the Debtor Corporation in this case, HUMPHREY'S PEST CONTROL COMPANY, INC. (herein "the Debtor"), in a transaction approved by this Court on January 18, 1985.

On December 5, 1985, Glenside (1) removed this entire case from the Philadelphia Court of Common Pleas to this Court as an adversarial proceeding in the Debtor's bankruptcy; and (2) filed what it termed a Third-party Complaint, but which appears to in fact have been a Second Third-party ·Complaint, against JAMES R. MELINSON, Trustee of the Debtor's Estate (hereinafter referred to as "the Trustee"). On January 13, 1986, the Broker and the Salesman filed a cross-claim against Glenside.

Then, on March 6, 1986, Glenside filed a Motion for Summary Judgment, contending that it was relieved of all libility to the Seller, the Broker, and the Salesman, on the ground that the transaction preceded its acquisition of the Debtor and the Bill of Sale precluded its liability for pre-purchase transactions. On April 9, 1986, this Motion was granted, leaving Glenside out of the case but also leaving this Court, without the party which brought it here, with this lawsuit. At this point, the presence of the Trustee as a party was the only even remote connection of this matter with the bankruptcy court.

On September 3, 1986, the Buyers moved to amend their Complaint to change their pleading of damages originally sought, which was granted on October 7, 1986. However, on October 30, 1986, the Buyers moved to file a Second Amended Complaint, seeking to add MARY A. SCHUEHING, ESQUIRE, the daughter and the administratrix of the estate of the Seller (hereinafter referred to as "the Daughter"), as a party defendant. This Motion was granted on December 4, 1986. On January 14, 1987, the Second Amended Complaint was filed by the Buyers. On February 9, 1987, the Broker and the Salesman filed an Answer, including a cross-claim against the Daughter and the Trustee. On February 17, 1987, the Daughter

filed an Answer, including cross-claims against the Broker and the Salesman and the Trustee.

On April 28, 1987, we attempted to bring to a close this burgeoning thicket of cross-pleadings and cross-accusations by issuing a Pre-trial Order which, *inter alia*, set July 23, 1987, as a trial date. The Daughter then filed a Motion to "remand" this matter to the District Court, where it had in fact never previously been, and requested a Jury Trial. After an Order scheduling briefing on this Motion on June 11, 1987, in which Order we posed a specific question as to the timeliness of the Jury demand, the Daughter withdrew the Motion on June 16, 1987.

The trial was ultimately continued by agreement of the parties to September 9, 1987, and heard that day and in a long session on September 11, 1987. After completion of the trial, we entered an Order of September 14, 1987, requesting the parties to file Proposed Findings of Fact, Conclusions of Law, and any post-trial Briefs to supplement those requested per our Pre-Trial Order by October 19, 1987 (the Buyers) and November 20, 1987 (all other parties). With receipt of the Daughter's materials on November 25, 1987, the remittances per our Order were complete.

In light of Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a), and the prime importance of factual determinations and credibility evaluations arising from the counter-testimony from a veritable multitude of witnesses, we are preparing our Opinion in the form of Findings of Fact and Conclusions of Law. The elaboration of pertinent legal principles required, being relatively less significant than in many of our decisions, is included within extended discussions in our respective Conclusions of Law rather than in a separate Discussion portion of the Opinion.

## B. FINDINGS OF FACT

1. On March 21, 1984, John B. France, then husband of the Seller, was hospitalized permanently through the date of his death on August 4, 1984.

2. As a result of her husband's terminal illness, the Seller, ill herself and depressed, left the Premises where she and her husband had resided for almost twenty (20) years in order to reside with the Daughter, where she remained until her death on July 3, 1986.

3. The Seller did not desire to return to the Premises permanently alone, and in fact came back there, with a companion, only from mid-October, 1984, to December, 1984. She desired to sell the Premises and placed all responsibility for selling the property in the hands of the Daughter, a practicing attorney.

4. On or about September 14, 1984, the Daughter, in furtherance of this responsibility, had the Seller enter into an exclusive listing agreement for the Premises with the Broker.

5. In October, 1984, the Buyers, attracted to the property, contacted the Broker and were shown the property on his behalf by the Salesman.

6. Shortly thereafter, the Buyers informed the Salesman that they wanted to make an offer to purchase the Premises for $81,000.00.

7. The Husband-Buyer, also a practicing attorney, advised the Salesman that the Buyers wanted clauses in the Agreement of Sale that would afford the Buyers protection against any problems from termites; requiring the Seller to provide a certification that the roof was free of leaks; and stipulating that they could conduct a pre-settlement plumbing, heating and electrical inspection. The termite issue was particularly important to the Buyers, as they had experienced concealed termite damage after the purchase of their present home, and they expressed a strong intention to avoid a repetition of this problem to the Salesman.

8. The Salesman told the Husband-Buyer that the printed Agreement of Sale which the Broker's office used contained a clause which would protect him from any problems with termites. The Husband-Buyer and the Salesman then mutually drafted special clauses concerning the roof certification and the plumbing, heating and

electrical inspections, which the Wife–Buyer, a highly-capable individual employed as the Director of the Drug and Alcohol Treatment Outreach Program at the Gaudenzia House, typed up herself.

9. The complete text of the Special Clauses were as follows:

Seller to supply certification from a registered roofer that roof is sound and free of leaks.

Buyer at their expense shall have plumbing, heating and electrical systems inspected to insure they are in proper working order. If said inspection reveals any defects in excess of $500 seller has option to cancell contract. Said option must be exercised within 3 days after results of inspection are known.

Cost for needed repairs, if any, is at the expense of the seller. The work, if any, recommended by buyers' contractor can be performed by a competent contractor of seller's choice.

Buyer to initial changes within three days or contract is null and void.

10. The test of the clause relating to termites was as follows:

18. INFESTATION. Seller shall, at seller's expense, deliver to Buyer at final settlement a written Inspection Report from an Exterminating Company, licensed by the Pennsylvania Department of Agriculture, that an inspection was made within sixty (60) days of the date of settlement of all visible and readily accessible areas of existing buildings and that no evidence of existing termite or other wood destroying infestation was found. If such infestation is found, it shall be eliminated at Seller's expense.

11. The initial purchase offer was rejected by the Seller, but a subsequent offer to purchase the Premises for $87,500.00 was accepted, and a new Agreement of Sale, dated October 31, 1984, was prepared, containing the same relevant clauses, per Findings of Fact 9 and 10, as were in the previous Agreement.

12. The Buyers did not observe the termite infestation nor any of the termite damage or roof leaks on the Premises during any pre-purchase inspections of the Premises, nor were such damages reasonably observable. The Buyers reasonably relied upon the clauses in the Agreement of Sale and the verbal reinforcement from the Salesman that these provisions in the Agreement were sufficient to protect them from liability for termite infestation, termite damages, and roof leaks caused by pre-settlement conditions.

13. From October 13, 1984, until the early part of December of 1984, the Husband–Debtor called the Salesman and the Broker two or three times each week, reiterating a desire to settle before the end of the year for income-tax purposes and a desire to see the termite inspection certification as soon as possible.

14. After the Agreement of Sale was accepted by the Seller, the Salesman assisted the Buyers in locating a mortgage company, but thereafter had very little involvement with this transaction. The conveyancing department of the Broker's office handled the necessary items to be completed prior to settlement, including ordering certifications.

15. At the time of signing of the Agreement of Sale, the Daughter authorized the Broker to obtain a termite certification.

16. Accordingly, on or about December 4, 1984, at the request of the Broker, James White, Jr., of White Exterminating Company made a visual check of the premises for termite infestation. When he had finished his inspection, he showed the Seller and another unidentified individual at the Premises active termite infestation which he found on a back porch post of the Premises, and, the next day, presented the Broker with a written report and estimate bill for treatment at a total cost of $385.00.

17. On or about December 5, 1984, the Broker and the Daughter had a telephone conversation regarding the contents of this report, in which the Daughter advised the Broker that she did not accept the White report and would therefore contact another termite company for an inspection.

18. The Daughter proceeded to have the Debtor perform a termite inspection of the premises.

19. On or about December 12, 1984, Edward Quartucci, an inspector employed by the Debtor, allegedly inspected the subject premises for termites and produced a report indicating that he had discovered no active infestation, but had located old inactive termite tubes "in basement."

20. Neither prior to nor at the time of inspection was Mr. Quartucci or the Debtor ever informed by anyone that there had been a prior termite inspection on December 5, 1984, by the White Extermination Service which had discovered active termite infestation on the back porch of the subject premises.

21. The Debtor's report states that the inspection specifically excluded areas such as "behind or beneath covered ceilings, walls, paneling, siding, floors, crawlspaces, furniture, stored items, painted surfaces, etc." and that the Debtor "does not attest to the structural soundness of the building" and recommended that "such a determination [regarding structural soundness] be made by an individual qualified in construction or related fields."

22. The failure of Mr. Quartucci to locate the termite infestation or the damage from termites to the back porch post was negligent, and his report of inactive termite tubes in the basement, which he explained as *not* including the portion of the basement including the crawlspace, would indicate that he identified a phenomenon not seen by any other person, and the existence of which is extremely doubtful.

23. From December 4, 1984, until December 31, 1984, the Husband–Debtor continued to call the Broker concerning arrangements for settlement on almost a daily basis. Despite his requests regarding the status of any termite reports or certifications, the Broker did not tell the Husband–Debtor about the White report, but rather told him that everything was going smoothly and that he would be given a termite certification at the settlement.

24. At the settlement on December 31, 1984, the Daughter gave the Buyers the termite certification from the Debtor and both the Daughter and the Broker reassured them that the Debtor's certification was accurate and that the house had no termite problems.

25. At the settlement, the Buyers were also given, by the Daughter, a bill for roofing work done to the Premises in 1973 by Chapman Roofing and Gutters which stated that a "20–yr. guarantee" was given, in lieu of a roof certification. The Husband–Buyer justifiably became angry at this attempt to avoid giving the requisite certification, and threatened not to complete settlement. The Daughter, however, assured the Buyers that she would subsequently supply them with a proper roof certification if they would complete the settlement. Based on these assurances, the Buyers completed settlement.

26. At no time during the course of the settlement did the Seller, the Daughter, or the Broker inform the Buyers that White Exterminating Service had inspected the Premises and found active termite infestation there.

27. The Daughter testified that, once settlement was accomplished, she completely forgot about the roofing certificate; accordingly, no such certification was ever provided to the Buyers.

28. The Daughter presented herself as an extremely tempermental and difficult person with whom to reason. We find that the Broker failed to inform the Buyers of the White inspection report largely to avoid the wrath of the Daughter, and that the credibility of the Daughter generally was unimpressive.

29. On or about January 21, 1985, in the course of a telephone conversation with James White, Sr., of White Exterminating Service, whom the Buyers had called to obtain a termite certification in connection with the sale of their own property, Mr. White, Sr., told the Husband–Buyer that his son had performed an inspection of the Premises and found active termite infestation on the back porch there.

30. The Husband–Buyer immediately telephoned the Broker's office, demanded a copy of the White report, and received same. Had it not been for the conversation with Mr. White, Sr., the Buyers would have

never been told about the existence of this report.

31. In March or April of 1985, after the Buyers moved into the Premises, the twin brother of the Husband–Buyer, James Manes of Clover Construction, began renovations to the interior of the Premises and discovered what he believed was evidence of extensive termite damage in the walls of the Premises, causing the Buyers to cease renovations to the Premises.

32. On March 20, 1985, during the course of a rain storm, the rear porch roof of the Premises began leaking. Nine days later, again during a rain storm, the rear porch roof leaked, and it has continued to leak thereafter.

33. On November 12, 1985, after the institution of this lawsuit, the Buyers hired Dr. Thomas A. Parker, an entomologist, to inspect the Premises. He found active termite infestation on the rear porch, and extensive termite damage from termites around the entire perimeter of a crawlspace in the basement area under the living room. He also believed that termite damage was likely to have occurred to the living room wall above the crawlspace, but testified that the wall would have to be opened to determine the certainty and extent of same. The Buyers, however, have not followed his advice to have the wall opened, and provided cosmetic reasons for not doing so which, in light of the circumstances, were unconvincing.

34. On April 4, 1987, Albert E. Tantala, a duly-licensed engineer, who was hired by the Buyers to examine the Premises for structural soundness, testified that the back porch post was unsound and that the cost to replace the post would be approximately $750.00. He also contended that virtually all of the floor joists and the wood structural members in the crawlspace were structurally unsound, could not support the normal loads of a single-family dwelling, and were in immediate need of either replacement or repair. Like Dr. Parker, he suspected that the wall over the crawlspace had also been damaged by termites.

35. Mr. Tantala's use of a hand penetrometer to measure the structural soundness of certain supporting members in the Premises was attacked by a civil engineer called by the Trustee, John Lima, who claimed that this device was used exclusively for soil tests. Mr. Tantala admitted that the device was commonly used only in soil tests.

36. Paul Petrille of Triangle Construction Co. testified regarding an estimate of December 3, 1985, which he prepared for the Buyers to repair certain of the alleged damages as follows:

| | |
|---|---|
| Roof and Posts on Porch | $ 3,450.00 |
| Replace joists in crawlspace | 1,274.00 |
| Remove and replace siding and drywall in living room wall over crawlspace | 11,655.00 |
| Remove and replace siding and drywall on front living room wall | 2,197.00 |
| Remove and replace siding and drywall on rear living room wall | 5,827.00 |
| Subtotal | $24,403.00 |
| Contingency work on second floor | 7,268.00 |
| Total | $31,671.00 |

Mr. Tantala stated that he estimated all of the work except the contingency work at $26,168.00.

37. Meanwhile, the Daughter called Leonard Kleeman, a building inspector, who stated that no repairs were needed on the joists; that the porch post would cost $500.00 to $700.00 to replace; and that the porch roof would cost $1,000.00 to $1,500.00 to repair.

38. The Broker and the Salesman called James M. Taurino, a general contractor and builder, who stated that damage to the joists was minimal, and estimated the costs of repairing the porch post and roof at $500.00 and $1,100.00, respectively.

39. The Buyers called Barry Grife, a real estate appraiser, who testified that, by deducting a $57,000.00 figure for repairs posited to him by the Buyers from the $87,500.00 value of the Premises, the property was valued at $30,000.00 as of December 31, 1984.

40. The Broker and the Salesman called Anthony Salvitti, also a real estate appraiser, who testified, from an inspection and comparative sales data, that the value of the Premises was $73,000.00 to $81,000.00

on December 31, 1984, and $110,000.00 at present.

41. On August 12, 1986, the Buyers hired and paid $672.00 to Orkin Exterminating Co. to eliminate all active termite infestation in and about the Premises. No convincing reason was given by the Buyers for delaying the performance of this service after it was known to be necessary for such an extensive period of time.

42. Apparently shortly after the Orkin services were performed, and probably the reason for doing so at that time, the Buyers successfully applied to Home Unity Savings and Loan Association (hereinafter referred to as "Home Unity"), to refinance their mortgage in order to take advantage of declining interest rates. However, nowhere on the application for this loan did the Buyers reveal, in questions relating to same, that they were parties to this or any other lawsuit, or that there was any termite infestation or termite damage in the Premises. Home Unity, in granting the application, appraised the Premises at $115,000.00.

43. We find that the Buyers were credible witnesses regarding all events through their discovery of the White Exterminating Service report on January 21, 1985, and were properly outraged at the attempt of the Daughter and the Broker to hide this report from them. However, we find the Buyers not totally credible in their testimony as to the events thereafter, which indicate an attempt to maximize the actual damages suffered as a result of the conduct of the Daughter and the Broker. We believe that their choice, against the advice of their own experts, not to open the walls and allow determination of the full extent of the termite damage therein and their failure to disclose the termite damages alleged in this lawsuit to Home Unity reveals their own suspicions that they have no evidence to support the claims of damages to their walls.

44. We credit the testimony of the Salesman that he had little or no involvement with the transaction at the time that the White report arrived, especially since he was willing, on questioning from the Court, to criticize the conduct of the Broker, his principal, to his face for not disclosing the White report to the Buyers.

45. Neither the Daughter nor the Broker offered any justifiable reason for failing to disclose the White report to the Buyers. The Daughter's credibility, particularly her "forgetting" about the roof certification, was very doubtful generally. This is especially so because the roof began leaking shorting thereafter, causing us to draw the inference that no roof certification was obtained principally because the Daughter knew that the roof was unsound and that no such certification could have been obtained.

46. The alleged "appraisal" of Mr. Grife, consisting of mere subtraction of figures supplied by the Buyers, which we do not find supported by the record as to the extent of the damages claimed, is not actually an appraisal and is virtually worthless.

47. Although the appraisal by Mr. Salvitti was of more value, it is not very useful either, given our ultimate holding that damages should be measured by the cost to repair the defects which the Daughter and the Broker failed to disclose to the Buyers rather than the difference between the market value of the Premises and the price paid.

48. While Dr. Parker was a very credible witness, his testimony failed to support a firm conclusion that severe termite damage existed other than at the back porch post and in the crawlspace. He devoted most of his attention during his inspection and testimony to the crawlspace, and provided much less certain testimony regarding damages to any of the walls.

49. Given the questionability of his use of a hand penetrometer to measure structural soundness of the Premises's members, we find Mr. Tantala's testimony somewhat less credible than that of Dr. Parker, and we believe that he overstated the dangers arising from the damages to the joists. Like Dr. Parker, he was not able to provide any convincing evidence of damage to the walls.

50. Mr. Petrille, whose testimony was punctuated with certain dissatisfaction with the Buyers for calling him as a witness, was refreshingly candid and totally credible. We credit his estimates regarding the costs to repair the porch post and roof and the joists over that of Messrs. Kleeman and Taurino, particularly Mr. Kleeman, who embellished his report with unnecessary criticism of the Buyers, leaving the impression that his testimony was overly influenced by the party who hired him. However, Mr. Petrille did not testify regarding the need for any particular repairs and we therefore can only accept his figures regarding repairs to the porch roof, the porch post, and the crawlspace joists as relevant to our disposition.

## C. CONCLUSIONS OF LAW

■ 1. The failure of the Seller to supply the roof certification was a clear violation of the first paragraph of the Special Clauses in the Agreement of Sale, and her estate is liable therefor. This is so even though the Seller herself may have been innocent of any misrepresentations, as the Daughter was delegated broad authority to handle this transaction for her mother, due to the latter's illness and confusion due to the recent death of her husband. *See Aiello v. Ed Saxe Real Estate, Inc.*, 508 Pa. 553, 558–63, 499 A.2d 282, 285–87 (1985) (principal is liable for its agent's misrepresentations to third party despite his personal lack of participation in making the misrepresentations); and *Glanski v. Ervine*, 269 Pa.Super. 182, 192, 409 A.2d 425, 430 (1979) (seller liable for his broker's failure to disclose a condition which the seller testified that he thought that the broker had disclosed to the buyers).

■ 2. Given her broad delegation of authority and her personal extensive role in causing the Seller's breach of this contract provision, the Daughter is also liable therefor. *See In re J & J Record Distributing Corp., Judge v. Pincus, Verlin, Hahn & Reich, P.C.*, 80 B.R. 53, 55 (Bankr.E.D.Pa. 1987) (counsel acting as an agent for a debtor-in-possession is liable for counsel's own negligent actions which resulted in a breach of the principal's fiduciary duties); *Aiello, supra* (agent liable as well as his employer-broker); *Glanski, supra* (broker liable as well as seller of home); and RESTATEMENT (SECOND) OF AGENCY, § 354, at 125–29 (1958). Hence, we hold the Daughter and the Seller's estate are jointly and severally liable for the sum necessary to repair the porch roof, i.e., $2,700.00. *See* Conclusions of Law, ¶ 6 *infra*.

3. There is no evidence of any role of either the Broker or the Salesman in the violation of the Agreement of Sale provision requiring that a roof certificate be supplied, thus restricting the Buyers' remedies for same to the Seller and the Daughter only.

■ 4. The failure of the Seller, the Daughter, and the Broker to advise the Buyers of the existence of the White Exterminating Service report constitutes fraudulent conduct towards the Buyers on the part of each of these parties.

Actual fraud has five elements: there must be (1) a misrepresentation of material fact; (2) scienter; (3) intention by the maker to induce the recipient to act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as a proximate result. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Superior Ct. 90, 464 A.2d 1243 (1983). *Kuehner v. Parsons*, — Pa.Cmwlth. —, —, 527 A.2d 627, 629 (1987).

All of these elements are present here. As is established in *Roberts v. Estate of Barbagallo*, — Pa.Super. —, 531 A.2d 1125, 1130 (1987), "a vendor or his agent may be liable not only for failure to disclose a dangerous condition but also for failure to disclose material information." That case involved a failure of the seller or its broker to disclose the existence of the presence of ureaformaldahyde foam insulation (hereinafter referred to as "UFFI") in the premises. Although the court found that the plaintiff had presented no evidence that the presence of UFFI created an unreasonable risk of harm to her, the court nevertheless found that the failure to dis-

close its presence was "intentional" and related to "material information." *Id.* at 1130–31.

Here, the failure to disclose the White report was clearly intentional and was material to an issue with which the Buyers were extremely concerned and about which they repeatedly inquired of the Broker. Clearly, then, a "material misrepresentation" arose from the willful failure of the Broker and the Daughter to inform the Buyers of the information contained in this report. Other cases establishing that a failure to disclose material information constitutes a fraudulent misrepresentation in similar factual contexts include *Slaybaugh v. Newman*, 330 Pa.Super. 216, 222, 479 A.2d 517, 520 (1984); *Mancini v. Morrow*, 312 Pa.Super. 192, 202, 458 A.2d 580, 585 (1983); *Adams v. Euliano*, 299 Pa.Super. 348, 352, 445 A.2d 788, 790 (1982); and *Quashnock v. Frost*, 299 Pa.Super. 9, 23, 445 A.2d 121, 128 (1982). *See also* Annot., *Duty of Vendor of Real Estate to Give Purchaser Information as to Termite Infestation*, 22 A.L.R.3d 972, 977 (1968); and RESTATEMENT (SECOND) OF TORTS, §§ 550–51, at 118–26 (1977).

Clearly, there was "scienter" on the part of the Broker and the Daughter, both of whom knew of the White report and failed to disclose it until the Buyers coincidentally learned of its existence through Mr. White, Sr. Also, both acted, in our opinion, with a clear motivation of attempting to falsely reassure the Buyers that no possible termite infestation was present in the Premises, in order to benefit financially by consummating the sale. Having no reason to know of the existence of this report, the Buyers clearly justifiably relied upon the absence of any negative report. As we discuss in Conclusion of Law, ¶ 6 *infra*, certain damages clearly were caused to the Buyers as a result.

Therefore, all of the elements of actual fraud are present here, and fraud on the part of the Daughter, the Seller, and the Broker are found. We exonerate the Salesman from this liability due to his lack of active involvement in this element of the transaction.

The Seller's liability, as is indicated in *Aiello, supra,* arises despite her possible lack of scienter of the misrepresentations of her agent-Daughter. 508 Pa. at 558–63, 499 A.2d at 285–87. The Daughter is clearly liable for her own deceit, although serving in the capacity as the Seller's agent. *Roberts, supra,* —— Pa.Super. at ——, 531 A.2d at 1130; and RESTATEMENT (SECOND) OF AGENCY, § 348, at 112–15 (1958).

■ 5. The fact that the Agreement of Sale only requires that the Seller provide a certification of the absence of existing termite infestation and pay for elimination of same does not preclude the Buyers from recovering for concealed termite-related damage, and such damages are particularly recoverable in light of the fraud of the Broker, the Daughter, and the Seller.

The Broker and the Salesman argue in their Brief that, since paragraph 18 of the Agreement of Sale (see Finding of Fact ¶ 10, page 691, *supra*) relates only to the Seller's requirement to certify the absence of existing termite *infestation* and pay for the elimination of same, that the Buyers may not recover for termite-related *damages.* Although we agree that paragraph 18 relates only to active infestation, we do not believe that this paragraph or any other paragraph of the Agreement of Sale relieves the Seller, or those whose conduct allows the Seller to do so, from liability for any hidden defects to the home, whether termite-related or not, which the Buyers failed to discover due to the failure of the Seller and her agents to disclose material information to them. *See, e.g., Mancini, supra,* 312 Pa.Super. at 202, 458 A.2d at 585; and *LeDonne v. Kessler,* 256 Pa.Super. 280, 291–92, 389 A.2d 1123, 1129 (1978).

We believe that the failure to disclose the White inspection report was a material factor in the Buyer's failure to discover the termite damage to, as well as the present active termite infestation in, the Premises. Had the Buyers received this report, they conceivably would have known as much as the Seller, the Daughter, and the Broker did about termite activity at the Premises,

and this may have protected those latter parties from liability. Further, had they known of this report, the Buyers may well have had the entire Premises inspected carefully for past damages as well as for present infestation from termites. Therefore, there is a causal connection between the failure of the Buyers to receive the White report and their failure to uncover the termite damage to the Premises, which we believe renders the parties implicated in the fraudulent concealment of this report—the Seller, the Daughter, and the Broker—liable to the Buyers for the concealed termite damage.

A related argument not made by any of the defending parties, probably because of its rather plain lack of merit, is the contention that the Buyers are barred from recovery for termite damage by the combination of a clause that they have inspected the property and are purchasing it due to that inspection (paragraph 19 of the Agreement of Sale) and the application of the "parol evidence rule."

However, as we observed in *In re Dinkins, Dinkins v. Margaretten & Co.,* 79 B.R. 253, 258–60 (Bankr.E.D.Pa.1987), it is clearly established that the "parol evidence rule" does not bar a home purchaser's claims for damages arising from hidden defects in a home purchased. *See also Mancini, supra;* and *LeDonne, supra.* Clearly, the damages to the home from past termite infestation here were not readily observable by the Buyers. Furthermore, the Third Circuit Court of Appeals, in attempting to harmonize the various Pennsylvania cases addressing the impact of the "parol evidence rule" in *Betz Laboratories, Inc. v. Hines,* 647 F.2d 402, 408, has held that "fraud vitiates every agreement that it touches." Here, we found that the Seller, the Daughter, and the Broker were guilty of fraud in failing to disclose the White report. In such a situation, the *Betz* court holds, there is no valid contract containing the purportedly exculpatory inspection clause. *Id.* at 406. There being no contract, there can be no application of the "parol evidence rule" against the Buyers here.

6. The Buyers have established damages of $2,700.00 for the roof repairs and $2,696.00 for the correction of the termite infestation and past termite damage to the Premises.

Our beginning point is the truism that the plaintiff always has the duty of establishing damages by proper evidence. *See, e.g., Gordon v. Trovato,* 234 Pa.Super. 279, 282, 338 A.2d 653, 654 (1975). While the plaintiff's burden is merely to prove damages with "reasonable certainty," *see In re Chapman,* 77 B.R. 1, 6 (Bankr.E.D.Pa. 1987), it is essential that the plaintiff establish the fact of damages, as opposed to the precise amount of damages, the computation of which does allow a court some discretion. *See Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). *See also Keystone Floor Products Co. v. Beattie Mfg. Co.,* 432 F.Supp. 869, 880–82 (E.D.Pa.1977); and *Taylor v. Kaufhold,* 368 Pa. 538, 546, 84 A.2d 347, 351 (1951).

Here, we have determined that Mr. Petrille's testimony that the cost of all repairs to the porch is $3,450.00 is credible. Of that sum, $750.00 is, per Mr. Tantala's credible testimony on this point, attributable to the porch post and hence to termite damage rather than damage to the roof. The balance of $2,700.00 is, we find, reasonable compensation for the roof damages.

There is a large range of figures proffered by the various parties as the proper measure of the termite damage to the Premises, ranging from $57,000.00, the Buyers' very wishful figure dependent upon Mr. Grife's "non-appraisal," to $385.00, the figure which the White report estimated would be necessary to eliminate the infestation.

We believe that the Buyers have established the fact of past termite damage to the Premises, by the requisite proper evidence, only to the back porch post and in the crawlspace. Again using Mr. Petrille's figures, we conclude that the reasonable cost of repairing these damages is $750.00 plus $1,274.00 or $2,024.00. Adding there-

to the $672.00 paid by the Buyers to finally eliminate the active infestation in August, 1986, yields a total sum of termite-related damages of $2,696.00. We shall hold the Broker, the Daughter, and the Seller's estate jointly and severally liable for this sum.

We fail to find that the Buyers proved termite damage to any of their first-floor walls, or elsewhere in the Premises. The testimony of Dr. Parker and Mr. Tantala is much more specific, detailed, and convincing regarding the damages to the joists in the crawlspace than to any of the walls. The element of damage to even the crawlspace joists was disputed, but we believe that the weight of the more credible evidence supports the Buyers' claim for replacement of the joists.

■ However, as to their claims for damages to the walls, the Buyers themselves cast doubt on these claims due to their refusal, for a duration of now almost three years since the home purchase, to open the walls in order that the damages to the walls can be measured instead of being the subject of conjecture. Any finding of damages to the walls due to termite infestation would, we believe, be pure speculation at this juncture. We also reiterate that the Buyers' failure to disclose any termite damages to the Premises to Home Unity, misconduct which we believe rises to almost the same level as the fraud of the Broker and the Daughter in failing to disclose the White report to them, weighs heavily in our determination that these damages are of questionable existence and severity.

■ 7. Since it is obviously practical to cure defects totalling $5,396.00 in a home presently worth in excess of $100,000.00, the measure of damages must be the cost of repairs.

In the factual context of *Sands v. Forrest,* 290 Pa.Super. 48, 51, 434 A.2d 122, 124 (1983), where the plaintiff buyers uncovered $40,000.00 in undisclosed damages to a farm property purchased for $85,000.00, we can fully understand the court's statement that "in an action for fraud and deceit the measure of damages is the difference between the real, or market value of, the property at the time of the transaction and the higher, or fictitious value, which the buyer was induced to pay for it." However, we believe that the later statement of Judge Spaeth in *Gadbois v. Leb-Co Builders, Inc.,* 312 Pa.Super. 144, 152, 458 A.2d 555, 559 (1983), that "if it is reasonably practical to cure the defects ... then the measure of damages is the cost of repairs," is more appropriately applied to the facts in this case. *See also, e.g., Bloomsburg Mills, Inc. v. Sordoni Construction Co.,* 401 Pa. 358, 364, 164 A.2d 201, 204 (1960); *Tyus v. Resta,* 328 Pa.Super. 11, 30–31, 476 A.2d 427, 437 (1984); and *Brourman v. Bova,* 198 Pa.Super. 279, 281, 182 A.2d 245, 146 (1962).

Therefore, we will measure the damages by the cost of repairs. We also add that the Grife "non-appraisal" would be, in our view, a most insufficient basis on which to measure the market value of the property with its current damages.

■ 8. The Trustee is liable to indemnify the Seller, the Daughter, and the Broker the amount of $672.00 due to his agent's negligence in failing to find the active infestation readily located by Mr. White, Jr., in an inspection just eight days before.

As Finding of Fact 22, page 692 *supra,* indicates, we are as skeptical of the competency and credibility of Mr. Quartucci, the Debtor's inspector, as we are of many of the other parties whose testimony we declined to credit. There is no logical explanation as to why he did not find the same condition present as Mr. White, Jr., who inspected the premises just eight days before. If the infestation on the back porch post was concealed before he appeared, he still should have seen the tell-tale damage to the post. His purported finding of "old inactive termite tubes" in the basement area *other* than the crawlspace, the latter of which he testified that he failed to examine, and thus which were in an area in which *no* other person has *ever* seen termite damage, results in an observation that Mr. Quartucci found what did not in fact exist on one hand and failed to find that did exist on the other. We are therefore skep-

tical of believing *anything* said by Mr. Quartucci. His testimony was a distinct contrast to the candor of Mr. White, Jr.

We considered two possibilities regarding Mr. Quartucci: (1) He and the Daughter were involved in an active conspiracy in the preparation of the report; or (2) He was a victim of the Daughter's duplicity, in that she failed to advise him of the White report and was not above concealing the infestation from him. We have no evidence to make a finding that either of the foregoing possibilities existed, but we consider the former, which the Daughter was also not above, more likely than the latter.

We will not, however, hold the Trustee liable for indemnification for any but the $672.00 cost to ultimately exterminate the termites which Mr. Quartucci overlooked. The Debtor's only engagement was to locate current infestation. His liability is primary, rendering him liable to indemnify the Seller, the Daughter, and the Broker, but only to that extent. *See Globe Indemnity Co. v. Agway, Inc.*, 456 F.2d 472, 474–75 (3d Cir.1972); and *TVSM, Inc. v. Alexander & Alexander, Inc.*, 583 F.Supp. 1089, 1091–92 (E.D.Pa.1984). We therefore decline to hold him primarily responsible for the aspects of the fraudulent conduct of the Broker and the Daughter in actions which concealed the termite damage to the premises.

Finally, in response to the Trustee's arguments to the contrary, we believe that the assertion of a third-party Complaint against the Debtor by the Broker and the Salesman in state court *and* the assertion of a cross-claim against the Trustee by those parties in this court were sufficient statements, given the generally confused state of the pleadings described at pages 689–690 *supra*, to put the Trustee on notice of this claim, as well as the admittedly properly-pleaded indemnification claim made against him by the Daughter. We therefore hold the Trustee liable to indemnify the Broker, the Daughter, and the Seller's estate, which are jointly and severally liable for, *inter alia*, this sum, in the amount of $672.00.

An Order consistent with our within Conclusions shall be entered.