66 F.3d 604
 33 Fed.R.Serv.3d 773, 27 UCC Rep.Serv.2d 823
 DUQUESNE LIGHT COMPANY, The Cleveland Electric Illuminating
Company, The Toledo Edison Company, Ohio Edison
Company, and Pennsylvania Power Company,
Appellants,
v.
WESTINGHOUSE ELECTRIC CORPORATION.
 Nos. 95-3027, 95-3045.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 25, 1995.
Decided Sept. 12, 1995.
 
 John H. O'Neill, Jr. (argued), James B. Hamlin, Linda S. Wendtland, David C. Goldberg, Shaw, Pittman, Potts & Trowbridge, Washington, DC, John H. Bingler, Jr., Deborah P. Powell, Thorp, Reed & Armstrong, Pittsburgh, PA, Edwyna G. Anderson, Larry R. Crayne, Duquesne Light Company, Pittsburgh, PA, for appellants.
 James W. Quinn, Mindy J. Spector (argued), Weil, Gotshal & Manges, New York City, Kevin W. Brode, Westinghouse Electric Corporation, Pittsburgh, PA, for appellee.
 Before: GREENBERG, COWEN and SAROKIN, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 
 1
 The plaintiffs appeal from judgments entered against them on all counts of their complaint. The district court granted the defendant summary judgment on certain of the plaintiffs' counts and dismissed others by granting defendant's motion made pursuant to Fed.R.Civ.P. 50(a) at the close of plaintiffs' case. On the one remaining claim, the jury returned a verdict in favor of the defendant. Because we find no merit in the myriad of issues the plaintiffs raise, we will affirm the judgment and orders of the district court.
 
 I. INTRODUCTION
 
 2
 The plaintiffs--Duquesne Light Company, The Cleveland Electric Illuminating Company, The Toledo Edison Company, Ohio Edison Company, and the Pennsylvania Power Company--together constructed and own the Beaver Valley Nuclear Power Station, a two-unit nuclear energy generating facility located near Pittsburgh, Pennsylvania. Duquesne points out that it had primary responsibility for supervising the construction of the plant, and it now "operates the plant on behalf of the co-owners." Br. at 5 n. 2. We therefore will refer to the plaintiffs singularly as Duquesne.
 
 
 3
 In the 1960's, Duquesne issued a request for proposals and bid specifications for equipment to be used at the plant. Westinghouse submitted a proposal, and, after negotiations, entered into a contract with Duquesne under which it agreed to supply Nuclear Steam Supply Systems (NSSS) for the Beaver Valley units. It is beyond doubt that during these negotiations the parties had sophisticated technical, commercial, and legal advice. The parties executed the contracts for the units respectively on October 3, 1967, and January 5, 1972. Each NSSS contains a nuclear reactor, three steam generators, and a number of other components that together convert heat from nuclear fission into steam. The steam generators for the first unit were installed in 1972; those for the second unit were installed in 1981. The units began commercial operations in, respectively, April 1977 and November 1987. Duquesne contends that when it negotiated the contracts, it sought steam generators that would last approximately 40 years and it points to facts that tend to support that contention. For instance the method of installing the NSSS equipment makes removing or replacing the steam generators extremely difficult.
 
 
 4
 In the 1980s, Duquesne discovered corrosion and cracking in the generators' "U"-shaped Inconel-made tubes through which radioactive water is pumped from the reactor vessel to the steam generators. Such corrosion and cracking affect both the plant's power output and safety. Duquesne engaged experts to examine the rapid deterioration who concluded, among other things, that the tube material--Inconel 600--made the equipment unusually susceptible to corrosion. Duquesne ultimately determined that it would have to replace the steam generators.
 
 
 5
 On April 30, 1991, Duquesne filed this action against Westinghouse alleging breach of contract, breach of warranty, breach of the Uniform Commercial Code duty of good faith, fraud, negligent misrepresentation, and violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Sec. 1962(b) and (c). On December 1, 1993, Westinghouse filed a motion for summary judgment on all counts of the complaint. The district court referred the motion to a magistrate judge who issued a thorough and detailed report and recommendation on July 18, 1994. In an order dated August 29, 1994, the district court adopted (with modifications) the magistrate judge's report and recommendation, and granted Westinghouse summary judgment on Duquesne's negligent misrepresentation claim and on its claim under 18 U.S.C. Sec. 1962(b). The court denied the motion in all other respects,[1] and rejected Westinghouse's argument that the various statutes of limitations and repose precluded Duquesne's claims.
 
 
 6
 The case proceeded to trial on September 12, 1994. At the close of Duquesne's case Westinghouse moved for judgment as a matter of law, and on October 24 the district court in a bench opinion granted that motion in most respects. It dismissed Duquesne's claims of breach of contract, breach of warranty, breach of the duty of good faith and fair dealing, and violations of RICO. It also dismissed Duquesne's claim for punitive damages. The court permitted Duquesne's fraud claim, however, to go to the jury. On December 6, 1994, the jury returned a verdict in favor of Westinghouse on that claim. The court entered judgment on December 7, and Duquesne timely filed a notice of appeal.[2] We have jurisdiction pursuant to 28 U.S.C. Sec. 1291. Because of the RICO claim, the district court exercised subject matter jurisdiction under 18 U.S.C. Sec. 1964(c) and 28 U.S.C. Sec. 1331, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. Sec. 1367(a).[3]
 
 II. DISCUSSION
 A. The Verdict
 1. The Trial Time Limitations
 
 7
 We begin with Duquesne's attack on the jury verdict, since the jury's findings impact on our analysis of the other claims. Duquesne's primary argument challenging the verdict involves the district court's allocation of trial time. During a pretrial conference, the parties and the court agreed to limit each side's time to 140 hours, to include the sum of that party's case, its cross-examination of the opposing party's witnesses, and its opening and closing arguments. App. 87. But on the 12th day of trial the court, frustrated with what it perceived as duplication of evidence, and concerned that the complicated technical testimony was confusing the jury, concluded that "all the business I have given you about 141 hours is off now." App. 823.[4] The court ruled that each side would receive 22 days to present its case. And since Duquesne already had used up 11 days, the court allowed it only an additional 11. App. 827-28. Furthermore, a "day" did not necessarily entail an entire day. Rather, as long as some testimony was heard on a given day, it counted as a full day. Duquesne argues that because it had budgeted its trial time during the first 11 days based on the 140 hour schedule, "[t]he district court's unilateral change in the basic trial rules caused irreparable prejudice" to its case. Br. at 34. We review a district court's decisions in its management of a trial for abuse of discretion. See Reed v. Philadelphia, Bethlehem & New England R.R. Co., 939 F.2d 128, 133 (3d Cir.1991) ("In matters of trial procedure such as that involved here, the trial judge is entrusted with wide discretion because he [or she] is in a far better position than we to appraise the effect" of a particular procedure on the parties.).
 
 
 8
 Although the procedural rules governing federal civil litigation do not explicitly authorize a district court to set time limits for a trial, a district court has inherent power "to control cases before it," provided it exercises the power " 'in a manner that is in harmony with the Federal Rules of Civil Procedure.' " G. Heileman Brewing Co. v. Joseph Oat Corp., 871 F.2d 648, 652 (7th Cir.1989) (en banc) (quoting Landau & Cleary, Ltd. v. Hribar Trucking, Inc., 867 F.2d 996, 1002 (7th Cir.1989)). The rules repeatedly embody the principle that trials should be both fair and efficient. Thus, the Federal Rules of Civil Procedure "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." Fed.R.Civ.P. 1. Similarly, the Federal Rules of Evidence "shall be construed to secure ... elimination of unjustifiable expense and delay." Fed.R.Evid. 102. More particularly, Fed.R.Evid. 403 allows judges to exclude even relevant evidence because of "considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
 
 
 9
 Numerous courts have inferred from these provisions a court's authority to set time limits. See, e.g., MCI Communications Corp. v. American Tel. & Tel. Co., 708 F.2d 1081, 1171 (7th Cir.) (setting a period of time for the trial is "not, per se, an abuse of discretion"), cert. denied, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); Harris v. Marsh, 679 F.Supp. 1204, 1235 & n. 42 (E.D.N.C.1987) (allowing each side a total block of hours for direct and cross examination), rev'd in part on other grounds, 914 F.2d 525 (4th Cir.1990), cert. denied, 499 U.S. 959, 111 S.Ct. 1580, 113 L.Ed.2d 645 (1991); United States v. Reaves, 636 F.Supp. 1575, 1580 (E.D.Ky.1986); SCM Corp. v. Xerox Corp., 77 F.R.D. 10, 13 (D.Conn.1977). We similarly believe that courts have discretion to impose limits on a party's trial presentation without the necessity of ruling specifically on "each particular item of evidence offered." SCM Corp., Id. at 13. After all, " 'it has never been supposed that a party has an absolute right to force upon an unwilling tribunal an unending and superfluous mass of testimony limited only by [its] own judgment and whim.' " MCI Communications, 708 F.2d at 1171 (quoting 6 Wigmore, Evidence Sec. 1907 (Chadbourne Rev.1976)). Indeed, some district judges have found that the imposition of time limits increases the efficiency of the trial from everybody's perspective. As one court has explained:
 
 
 10
 'It requires counsel to exercise a discipline of economy choosing between what is important and what is less so. It reduces the incidence of the judge interfering in strategic decisions. It gives a cleaner, crisper, better-tried case. It gives a much lower cost to the clients. Finally, it will save months of our lives.'
 
 
 11
 United States v. Reaves, 636 F.Supp. at 1580 (quoting Leval, From the Bench, Litigation, at 8 (1985)).
 
 
 12
 However, because by their very nature such procedures can result in courts dispensing with the general practice to evaluate each piece of offered evidence individually, district courts should not exercise this discretion as a matter of course. As one court has put it, witnesses should not be excluded "on the basis of mere numbers." MCI Communications, 708 F.2d at 1171. Rather, a district court should impose time limits only when necessary, after making an informed analysis based on a review of the parties' proposed witness lists and proffered testimony, as well as their estimates of trial time. And, the court must ensure that it allocates trial time evenhandedly. But still the courts need not allow parties excessive time so as to turn a trial into a circus. After all, a court's resources are finite and a court must dispose of much litigation. In short, the litigants in a particular case do not own the court.
 
 
 13
 The district court's action in this case differs from that taken in the cases we cite above because here the court granted each party a specific allotment of time, but halfway through Duquesne's case rescinded some of the grant. As a general matter, "it is the task of counsel, not the Court, to make the selection of materials most appropriate for introduction into evidence." SCM Corp., 77 F.R.D. at 12-13. Thus, while courts certainly should have flexibility in reassessing imposed time limits, they ordinarily should allow a party to fill its allotment with whatever evidence that party deems appropriate, subject, of course, to rules of admissibility independent of the overall time limitation for the case being tried. As a corollary, an allocation of trial time relied upon by the parties should not be taken away easily and without warning.
 
 
 14
 SCM Corp. provides a good illustration of when mid-trial imposition of time limits is appropriate. There, the court "repeatedly brought to the attention of plaintiff's counsel a concern that the pace of the trial seemed unlikely to comport with the original estimates." 77 F.R.D. at 13. The court sought witness lists, requested plaintiff's counsel to re-estimate the time he needed, "cautioned counsel that some more rigorous action would have to be taken to keep the trial within manageable limits and urged a reconsideration of the amount of material to be introduced and the presentation of a less ambitious schedule." Id. at 13. When the court's numerous efforts proved unavailing, it sua sponte imposed constraints upon the parties' trial time. But even then the court allotted plaintiff "50% more than the top range of counsel's [original] estimate." Id. at 15. In other words, while the court issued a time constraint order mid-trial, it still allowed the parties the only allocation of time upon which they reasonably could have relied.
 
 
 15
 Here, however, the district court neither requested nor reviewed any proffered materials prior to issuing its mid-trial order. While Westinghouse contends that the court repeatedly warned Duquesne of its cumulative presentation, it refers us only to a series of isolated instances over 11 days of testimony in which the court sustained objections because testimony was repetitive or because a question was asked and answered. See, e.g., app. 401 ("We have been through that before and we are not going to go through it again."); app. 649-50 ("We have been over this a number of times."); app. 666 ("We have been over this with another witness. We are not going to repeat it again."); app. 705-06 (sustaining "asked and answered" objection); app. 727 ("We have been over this."); app. 762 ("You have already asked him that."); app. 782 (sustaining "asked and answered" objection); id. at 794 (same). Thus, unlike in SCM Corp., the court here gave Duquesne little indication of the consequences of its trial behavior.
 
 
 16
 Further still, the method by which the district court calculated a party's time is puzzling. Westinghouse's cross-examination of Duquesne's witnesses counted against Duquesne's time, and vice versa. Therefore, Duquesne contends that the court's order, rather than promoting efficiency at trial, made it difficult for the parties to "control the clock and accurately budget their time." Br. at 34 n. 28. Finally, Duquesne almost certainly planned its trial strategy based on the initial 140 hour allotment, and when the court took its action well into its case, Duquesne had little opportunity to reassess its plans. Westinghouse, on the other hand, had a full 11 days, i.e., the balance of time remaining after the court modified the time allocation on Duquesne's case, to reassess its initial budget and modify its trial strategy accordingly.
 
 
 17
 Nevertheless despite our concern about the district court's action, we will not reverse because we are unable to conclude that its ruling had any impact on the outcome of the case. In the first place, Duquesne in its brief speaks of prejudice in vague and general terms, and therefore fails to delineate how the district court's decision adversely affected its case. Moreover, our independent review of Duquesne's motion for reconsideration of the altered trial schedule filed the day after the court's scheduling ruling as well as the offer of proof Duquesne made at the close of its case leave us unconvinced that its proposed testimony would have added much to what it introduced during its allotted time. Finally, the fact that Duquesne seems to use the district court's order to attack only the jury verdict but not the claims upon which the court granted Westinghouse judgment as a matter of law, makes us wary of accepting Duquesne's argument.[5] Therefore, we do not believe the district court's action constitutes reversible error, and we decline to reverse on this ground.
 
 2. The Jury Instructions
 
 18
 Next, Duquesne challenges the district court's jury instructions. We recently explained that:
 
 
 19
 Generally, '[t]he standard of review for the district court's ruling on points for charge is ... abuse of discretion.' Link v. Mercedes-Benz of North America, Inc., 788 F.2d 918, 922 (3d Cir.1986). Where, as here, a party contends that the charge as given states an incorrect legal standard, 'we will review the charge as a whole in the light of the evidence to determine if it fairly and adequately submitted the issues to the jury and we will reverse if the instructions were capable of confusing and thereby misleading the jury.' Griffiths v. CIGNA Corp., 988 F.2d 457, 462 (3d Cir.) (citing Limbach Co. v. Sheet Metal Workers Int'l Ass'n, 949 F.2d 1241, 1259 n. 15 (3d Cir.1991) (in banc)), cert. denied, --- U.S. ----, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993).
 
 
 20
 Fashauer v. New Jersey Transit Rail Operations, Inc., 57 F.3d 1269, 1273 (3d Cir.1995).
 
 
 21
 First, Duquesne contends that the district court erred in denying its request to charge the jury that nondisclosures can constitute fraud. In this ruling, the court relied on Restatement (Second) of Torts Sec. 551 which it determined constitutes Pennsylvania law on the issue. Section 551 of the Restatement provides that liability may be imposed on a party to a business transaction only when it has a duty to speak. That duty, according to the Restatement, exists only in limited circumstances, including (1) when there is a fiduciary, or confidential, relationship between the parties; (2) when disclosure is necessary to prevent an ambiguous or partial statement from being misleading; (3) where subsequently acquired knowledge makes a previous representation false; (4) where the undisclosed fact is basic to the transaction. Restatement (Second) of Torts Sec. 551(2).
 
 
 22
 The threshold inquiry on this point is whether Pennsylvania has adopted section 551. In Neuman v. Corn Exchange Nat. Bank & Trust Co., the Pennsylvania Supreme Court held that "[t]he deliberate nondisclosure of a material fact amounts to culpable misrepresentation no less than does an intentional affirmation of a material falsity." 356 Pa. 442, 51 A.2d 759, 764 (1947). Although the court did not delineate the elements of the tort, it specifically cited to Restatement section 551. Id. Numerous intermediate appellate courts in Pennsylvania have followed Neuman 's lead and held, following the principles in the Restatement, that to be liable for material nondisclosures, a party must have a duty to speak. In the oft-cited Smith v. Renaut, 387 Pa.Super. 299, 564 A.2d 188 (1989), the Pennsylvania Superior Court began its analysis by noting that " 'fraud consists in anything calculated to deceive, whether ... it be ... by speech or silence.... It is any artifice by which a person is deceived to his disadvantage.' " Id. at 192 (quoting McClellan's Estate, 365 Pa. 401, 75 A.2d 595 (1950)). But, the court continued, "[w]hile a concealment may constitute fraud, mere silence is not sufficient in the absence of a duty to speak." Id. In that case, the court held that "a seller has an affirmative duty to disclose a known termite infestation." Id. at 192 (citing Quashnock v. Frost, 299 Pa.Super. 9, 445 A.2d 121, 124 (1982) (in banc)). Similarly, in Wilson v. Donegal Mut. Ins. Co., 410 Pa.Super. 31, 598 A.2d 1310, 1315-16 (1991), the court held that "[c]oncealment can be a sufficient basis for finding that a party engaged in fraudulent conduct, ... however, mere silence is not sufficient in the absence of a duty to speak." See also Quashnock v. Frost, 445 A.2d at 130 (Spaeth, J., concurring) (relying on section 551). In Estate of Evasew v. Evasew, 526 Pa. 98, 584 A.2d 910 (1990), the Supreme Court of Pennsylvania explicitly approved the duty to speak prerequisite, holding that "an omission is actionable as fraud only where there is an independent duty to disclose the omitted information." Id. at 913 (relying on City of Harrisburg v. Bradford Trust Co., 621 F.Supp. 463 (M.D.Pa.1985)).[6]
 
 
 23
 But while Pennsylvania courts have adopted the duty to speak requirement, the cases leave us uncertain of the extent to which Pennsylvania law includes the Restatement's discrete criteria for when a duty to speak arises. Furthermore, the district court incompletely analyzed the elements of section 551--looking only at whether there was a confidential relationship between the parties. Nevertheless, we conclude that Pennsylvania courts would not impose liability in the circumstances of this case. Pennsylvania courts analyzing whether there was a duty to speak rely almost exclusively on the nature of the contract between the parties and the scope of one party's reliance on the other's representations. Thus, in the termite infestation cases, see Quashnock v. Frost, 299 Pa.Super. 9, 445 A.2d 121, and Smith v. Renaut, 387 Pa.Super. 299, 564 A.2d 188, the buyer is at the whim of the seller to disclose such latent problems, which are not discoverable by other reasonable means. In those circumstances, it cannot be said fairly that by failing to disclose the seller is legitimately enhancing his or her bargain. Similarly, in Neuman, the plaintiff "justifiably" relied on a bank's representation that another party had offered a specific amount for the stock itself, see Neuman, 51 A.2d at 764; in that case, the bank was the only reasonable source of the information. Id. at 765. And in Scaife Co. v. Rockwell-Standard Corp., 446 Pa. 280, 285 A.2d 451 (1971), cert. denied, 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806 (1972), the court analyzed the duty to speak under reliance principles, and held that "the jury could have concluded that [the defendant] knowingly abused [plaintiff's] confidence." Id. at 456.
 
 
 24
 None of these cases is applicable to the situation present here, where the two parties are sophisticated business entities, with equal and ample access to legal representation. "[S]uperior information and better business acumen are legitimate advantages, which lead to no liability." Restatement (Second) of Torts Sec. 551 comment k. As Westinghouse correctly points out, there is virtually no Pennsylvania case in which a defendant has been held to have a duty to speak when both the plaintiff and defendant were sophisticated business entities, entrusted with equal knowledge of the facts. We also note that while the court did not explicitly charge the jury to consider omissions, it permitted Duquesne's counsel to argue "that the misrepresentation consists of both a false statement and a partially correct statement that requires other information in order to be correct." App. 1930. This ruling was tantamount to allowing Duquesne to present its fraudulent omission claim to the jury.
 
 
 25
 Duquesne also contends that the district court's jury instructions did not permit the jury to consider Westinghouse's post-contract fraud. Duquesne relies on the district court's statement at the beginning of its charge that "[p]laintiffs allege that the defendant fraudulently induced them to enter into certain contracts by making false representations." App. 1978. However, the district court, in delineating the elements of a fraud claim, did not limit the claim temporally. Moreover, Westinghouse points out that the verdict form paralleled the substantive fraud instruction rather than the court's initial comments. Further still, the judge's preliminary instructions did include in its characterization of Duquesne's contention that Westinghouse "continued to defraud [Duquesne] by making additional misrepresentations...." App. 126. Finally, Duquesne in its closing arguments referred repeatedly to Westinghouse's post-fraud actions. Although the instructions were not absolutely clear we do not believe that the charge as a whole presents an incorrect view of the law.[7]
 
 
 26
 Finally, Duquesne argues that the jury verdict must be overturned because the district court made numerous evidentiary errors. In particular, it contends that the court erred in excluding two exhibits, an expert's testimony and certain rebuttal evidence. We have reviewed these claims and find no error of law or abuse of discretion in these rulings. We therefore will affirm the judgment entered on the jury verdict.
 
 B. The Judgment As a Matter of Law
 
 27
 Duquesne next challenges the district court's grant of Westinghouse's motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a). We exercise plenary review over the district court's grant of a Rule 50(a) motion, see McDaniels v. Flick, 59 F.3d 446, 454 (3d Cir.1995). A district court should grant such a motion only if, viewing all the evidence in favor of the nonmoving party, no reasonable jury could find liability on a particular point. Id. (citing Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir.1993)).
 
 1. Failure to Deliver Conforming Goods
 
 28
 Duquesne contends that the district court erred by refusing to send its contract claim of "failure to deliver conforming goods" to the jury. The district court granted Westinghouse's motion for judgment as a matter of law on this count, concluding that "[t]he contract is unambiguous in providing that the design life of the steam generators was not a guarantee." We agree.
 
 
 29
 Of course, the goal of contract interpretation is to discover the parties' objective mutual intent. Under Pennsylvania law " '[i]t is firmly settled that the intent of the parties to a written contract is contained in the writing itself.' " Samuel Rappaport Family Partnership v. Meridian Bank, 441 Pa.Super. 194, 657 A.2d 17, 21 (1995) (quoting Krizovensky v. Krizovensky, 425 Pa.Super. 204, 624 A.2d 638, 642-43 (1993)); see also Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir.1994) ("Pennsylvania courts apply the 'plain meaning rule' of interpretation of contracts which assumes that the intent of the parties to an instrument is 'embodied in the writing itself....' ") (citation omitted). Thus, where, as here, the parties have reduced their agreement to writing, Pennsylvania courts presume that the parties' mutual intent can be ascertained by examining the writing. Only where the writing is ambiguous may the factfinder examine all the relevant extrinsic evidence to determine the parties' mutual intent. Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1424 (3d Cir.1994). Therefore, as a preliminary matter, courts must " 'determin[e] as a matter of law which category written contract terms fall into--clear or ambiguous.' " Id. (citation omitted). There are, as we recently noted, two kinds of ambiguity, patent ambiguity and latent ambiguity:
 
 
 30
 ' "[a] patent ambiguity is that which appears on the face of the instrument, and arises from the defective, obscure, or insensible language used." Black's Law Dictionary 105 (rev. 4th ed. 1968). In contrast, a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous. Easton v. Washington County Ins. Co., [391 Pa. 28] 137 A.2d 332 (1957).'
 
 
 31
 Allegheny, 40 F.3d at 1424 (quoting Steuart v. McChesney, 498 Pa. 45, 444 A.2d 659, 663 (1982)).
 
 
 32
 Because of Pennsylvania's presumption that the writing conveys the parties' intent,
 
 
 33
 '[a] contract will be found ambiguous "if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction." '
 
 
 34
 Meridian Bank, 657 A.2d at 21-22 (quoting Krizovensky, 624 A.2d at 642-43).
 
 
 35
 Pennsylvania law permits courts to examine certain forms of extrinsic evidence in determining whether a contract is ambiguous. But lest the ambiguity inquiry degenerate into an impermissible analysis of the parties' subjective intent, such an inquiry appropriately is confined to determining "the parties' linguistic reference." Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 n. 12 (3d Cir.1980). In other words, "extrinsic evidence may be utilized to demonstrate the existence of a latent ambiguity." Meridian Bank, 657 A.2d at 22 (citing Lohmann v. Piczon, 338 Pa.Super. 485, 487 A.2d 1386 (1985)). Thus, as we pointed out in Mellon Bank, when the contract refers to $10,000, unless we looked at extrinsic evidence we might never learn that the parties were referring to Canadian rather than American dollars. 619 F.2d at 1011 n. 12. In making the ambiguity determination, then, we " 'consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning.' " Hullett, 38 F.3d at 111 (citation omitted).
 
 
 36
 The essence of Duquesne's contract claim is that Westinghouse agreed to provide steam generators that would last for 40 years. Unable to point to any provision in the contract that clearly supports this proposition, Duquesne predicates this claim largely on the following provision of the contract's technical specifications:
 
 
 37
 Consideration shall be taken of all NSSS components subject to the loss of ductility arising from integrated neutron exposure (nvt) based on a minimum station life of 42 yr operating at an 85 per cent load factor. The reactor internals shall be so designed that they may be completely removed by remote handling techniques without the use of divers.
 
 
 38
 App. 2228.[8] Duquesne's reading would stretch this language to unimaginable proportions, as it would turn the 42 year station life by which certain components were to be judged into an express contractual guarantee that the steam generators themselves would last for 40 years. Contrary to Duquesne's interpretation, this provision clearly and by its very terms covers only components subject to the loss of ductility arising from neutron exposure. Duquesne points to no evidence in the record that steam generators were subject to such loss of ductility. The evidence in fact shows the contrary. App. 488-89 (Campbell testimony) (steam generators are not "subject to the loss of ductility arising from integrated neutron exposure").[9]
 
 
 39
 Moreover, we find support in this interpretation from the format, construction and terms of the contract generally. First, the provision on which Duquesne relies is contained not in the contract proper but in its third exhibit which details "technical specification for nuclear equipment and nuclear steam supply system." There is an article in the contract proper entitled "Warranties," see App. 2159, which one would expect would include any such guarantee, if there was one, in explicit terms. Second, as we discuss below, the "Warranties" section provides in no uncertain terms that "[t]he warranties and remedies set forth herein are exclusive and are in lieu of all other warranties and remedies whether statutory, express or implied." Contract Art. IV(C) at app. 2162. That section provides that the equipment "shall be suitable for operation as part of the NSSS sold hereunder" but that "[t]he equipment warranty shall expire one year after successful completion of the Performance Test, but not later than three years after SHIPMENT, whichever occurs first." Art. IV(B) at app. 2160. A plain reading of this section precludes Duquesne's contractual argument.[10]
 
 
 40
 Duquesne does not dispute that this warranty provision is a binding part of the contract. Rather, it contends that the warranty clause contradicts the specification provision on which it relies, and therefore, " '[g]iven a head-on conflict between an express warranty and a disclaimer, the disclaimer is the one that suffers.' " Reply Br. at 5 (quoting 1 Quinn's Uniform Commercial Code Commentary and Law Digest Sec. 2-313[A], at 2-219 (2d ed.1991)). Whatever the merits of Duquesne's legal reasoning, here there is no head-on collision. To the contrary, the warranty provision simply confirms our straightforward reading of the specifications. After all, "[t]he strongest external sign of agreement between contracting parties is the words they use in their written contract." Mellon Bank, 619 F.2d at 1009.
 
 
 41
 Duquesne's argument would be more plausible if it cited evidence of custom in the industry in agreeing to contract terms, or the parties' prior practice. But the evidence on which it relies is not probative of ambiguity. First, it cites the technical bid specifications Duquesne issued to which Westinghouse apparently did not object. Br. at 20-21. Of course, the specific language in the contract trumps these specifications, but at any rate the documents are not inconsistent. Second, Duquesne relies on testimony that the parties, including Westinghouse, expected the steam generators to last for 42 years and that no provision was made to remove the steam generators if they became defective prior to that. Br. at 21-22. See, e.g., app. 899 (testimony of Westinghouse official Stern) ("I didn't think it was necessary to provide an opening in the vapor containment for the removal of the steam generator."); app. 423 (testimony of Duquesne representative recalling conversation with Stern); app. 317 (testimony of Superintendent of Construction at facility) ("There were no provisions made for the steam generators to be removed."); app. 371 (testimony of Duquesne representative regarding negotiations with Westinghouse) ("[M]y understanding was that in all the discussions we had with Westinghouse that the 42 years was the basis for the design of the plant."). Of course, the parties' expectations or hope that the steam generators would last for 42 years cannot form the basis for reading a provision into the contract. Duquesne cites no testimony that the drafters of the contract interpreted the provision it relies on to guarantee that the steam generators would function for 42 years. The closest Duquesne comes in the testimony of Campbell, quoted earlier (see supra, n. 9), who conceded that he could not find a provision in the bid specifications ensuring that the steam generators would last for 40 years.
 
 
 42
 As such, we will not rewrite the contract. We therefore affirm the district court's ruling granting Westinghouse judgment on this count of the complaint.
 
 2. Breach of Warranty
 
 43
 Next, Duquesne challenges the district court's dismissal of its breach of warranty claim. The contracts each provide that:
 
 
 44
 Westinghouse warrants that the equipment furnished hereunder by Westinghouse shall be free from defects in workmanship and material and shall be suitable for operation as part of the NSSS sold hereunder.
 
 
 45
 * * * * * *
 
 
 46
 The equipment warranty shall expire one year after successful completion of the Performance Test, but not later than three years after SHIPMENT, whichever occurs first. If, during said period, the Owner promptly notifies Westinghouse and establishes that the equipment warranty is not met, Westinghouse shall perform such repair replacement or modification as required to meet this equipment warranty.
 
 
 47
 app. 2160-61; app. 2338-39.
 
 
 48
 The district court, pointing out that "[t]he parties agree that the warranty period under the Beaver Valley I contract expired on July 1st, 1976, and the warranty period under the Beaver Valley 2 contract expired on May 31st, 1987," dismissed the claim for a number of reasons. First, it held that Duquesne's argument was "contrary to the unambiguous contractual language stating that the design life is not a guarantee." The court also reasoned as an alternative argument that "the evidence at trial has established that the alleged defect did not appear until after the expiration of the respective warranty periods. Plaintiffs did not negotiate for nor did they obtain a lifetime warranty regarding the steam generators."
 
 
 49
 Westinghouse is clearly correct that the contract clauses required the defect to manifest itself within one year.[11] Duquesne in substance argues that the contract protects it against defects existing at the time the generator was installed but not discovered until after the warranty period. Br. at 24. But the general rule, from which we see no reason to deviate, is that "an express warranty does not cover repairs made after the applicable time ... ha[s] elapsed." Abraham v. Volkswagen of Am., Inc., 795 F.2d 238, 250 (2d Cir.1986) (citing cases) (applying federal common law). Thus, " 'latent defects' discovered after the term of the warranty are not actionable." Id. at 249-50. For example, in Kodiak Elec. Ass'n v. DeLaval Turbine, Inc., 694 P.2d 150 (Alaska 1984), the defendant delivered a defective generator, but the defect manifested itself in an injury only after the expiration of the express warranty period. The court ruled that because "the defect did not make its presence known until the time of the generator failure, nearly a year after the warranty had expired," the plaintiff did not have a breach of warranty claim. Id. at 157 (applying Alaska law). That is precisely the case here. See also Canal Elec. Co. v. Westinghouse Elec. Co., 973 F.2d 988, 993 (1st Cir.1992) ("[C]ase law almost uniformly holds that time-limited warranties do not protect buyers against hidden defects--defects that may exist before, but typically are not discovered until after, the expiration of the warranty period.").
 
 
 50
 Duquesne tries to exempt itself from the general rule by pointing to differences in the warranty language between its contract and those covered by the cases we cited above. We find no qualitative difference in the language, however. To be sure, the clause in Canal Elec. Co. provided that evidence of the defect must "appear" within the warranty period. Id. at 991. But in the first place, that fact was incidental to the court's analysis. In that case, the plaintiff relied upon the word "appear" in arguing for an exception from the general rule. More importantly, the warranty language here is not ambiguous. It requires notice to Westinghouse of the defect within the warranty period. Of course, notice cannot be given of an undiscovered defect. Therefore, the district court's reading of the clause is the only fair reading. We will affirm the court's dismissal of the breach of warranty count.[12]
 
 3. Duty to Act in Good Faith
 
 51
 Duquesne also argues that the district court improperly granted Westinghouse judgment on its claim that Westinghouse breached its contractual duty to act in good faith and to deal fairly. The district court dismissed the count because "[p]laintiffs have not cited any specific provision of the contract which would support the alleged duty owed by Westinghouse." While the parties disagree about the scope of the duty provided in the Uniform Commercial Code.[13] We need not dwell on these disagreements because the doctrine, no matter how broadly interpreted, has no application here.
 
 
 52
 The Uniform Commercial Code provision on good faith, codified as 13 Pa.Cons.Stat.Ann. Sec. 1203 (1984), provides that "[e]very contract or duty within this title imposes an obligation of good faith in its performance or enforcement." Good faith is defined as "[h]onesty in fact in the conduct or transaction concerned." Id. Sec. 1201. "With rare exception, the courts use the U.C.C. good faith requirements in aid and furtherance of the parties' agreement, not to override the parties' agreement for reasons of fairness, policy, or morality." Steven J. Burton, Symposium: The Revision of Article 2 of the Uniform Commercial Code: Good Faith in Articles 1 and 2 of the U.C.C.: The Practice View, 35 Wm. and Mary L.Rev. 1533, 1534 (1994). Thus, courts generally utilize the good faith duty as an interpretive tool to determine "the parties' justifiable expectations," and do not enforce an independent duty divorced from the specific clauses of the contract. Id. at 1542. For example, a court may use the duty to impose a standard of conduct in a requirements or output contract, to ensure that the parties' actions conform to their reasonable expectations. See Denise R. Boklach, Comment: Commercial Transactions: U.C.C. Section 1-201(19) Good Faith--Is Now the Time to Abandon the Pure Heart/Empty Head Test?, 45 Okla.L.Rev. 647, 667 (1992) (citing cases).
 
 
 53
 The cases on which Duquesne relies all applied the good faith duty in this manner to delineate the parties' reasonable expectations. In Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 862 F.Supp. 1361 (E.D.Pa.1994), vacated in part on other grounds, 63 F.3d 1267 (3d Cir.1995), for example, the parties entered into a semi-exclusive agreement for distribution of the defendant's products in the Philadelphia area. Evidence showed that the defendant sold its goods "to distributors that, while situated just outside of Philadelphia, sold their goods into Philadelphia." Id. at 1367. Thus, there was a legitimate question regarding "the parties' reasonable expectations" of how the semi-exclusive distributorship arrangement would work. Id. In Doe v. Kohn Nast & Graf, P.C., 862 F.Supp. 1310 (E.D.Pa.1994), the court found that "[b]arring an attorney from access to two of the crucial tools of his trade ... is readily construable as an interference with, or at the very least a failure to cooperate in, the performance of his contractual obligations." Id. at 1325. Certainly, one would not expect a party with whom one has a contract to interfere with its ability to carry out its end of the bargain.
 
 
 54
 In the absence of a dispute about the parties' reasonable expectations under a particular term of the contract, an independent "duty of good faith has been recognized [only] in limited situations." Creeger Brick and Bldg. Supply, Inc. v. Mid-State Bank and Trust Co., 385 Pa.Super. 30, 560 A.2d 151, 153 (1989); Sensenig v. Spring Glen Farm Kitchen, Inc., 1992 WL 540682 at * 2 (Pa.Cm.Pl. Aug. 4, 1992). After all, "[i]f contracting parties cannot profitably use their contractual powers without fear that a jury will second-guess them under a vague standard of good faith, the law will impair the predictability that an orderly commerce requires." Burton, 35 Wm. and Mary L.Rev. at 1550. Thus, an independent contractual duty to act in good faith "has been imposed upon franchisors in their dealings with franchisees ... upon the relationship between insurer and insured ... [and] in connection with an employer's attempt to recoup theft losses from the wife of an employee who was responsible for the thefts." Creeger, 560 A.2d at 153-54 (citing cases); see also Loos & Dilworth v. Quaker State Oil Ref. Corp., 347 Pa.Super. 477, 500 A.2d 1155, 1160 (1985) ("[A] franchisor must act both in good faith and in a commercially reasonable manner when terminating a franchise.").
 
 
 55
 "The obligation to act in good faith ... varies somewhat with the context." Somers v. Somers, 418 Pa.Super. 131, 613 A.2d 1211, 1213 (1992). Here, Duquesne attempts to read into the contract a provision which it neither bargained for nor attained--a guarantee of 40 years. Furthermore, by its own admission Duquesne with this count is simply dressing up its fraud claim to avoid the "clear and convincing" evidentiary hurdle. See Br. at 27 ("This claim was particularly important because it could be proved by a preponderance of the evidence, as opposed to the 'clear and convincing' standard applied to the fraud claim."). In this context--where two sophisticated business entities have engaged in an arms-length transaction--we do not believe that Pennsylvania courts would impose an independent duty of good faith not tied to a contractual term.[14]
 
 C. The Summary Judgment
 
 56
 Finally, Duquesne challenges the district court's grant of summary judgment in favor of Westinghouse on its negligent misrepresentation claim. The district court adopted the magistrate's judge's reasoning and conclusion that the economic loss doctrine, which prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract, barred this count. We exercise plenary review over the district court's grant of summary judgment on this claim.
 
 
 57
 Although the economic loss doctrine can be traced to the 1965 decision in Seely v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), application of the doctrine gained momentum when the Supreme Court adopted it in the context of admiralty products liability law. In that posture, the Court held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). In reaching its decision, the Court, noting that "if [products liability remedies] were to progress too far, contract law would drown in a sea of tort," id. at 866, 106 S.Ct. at 2300, reasoned that "[w]hen a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong." Id. at 871, 106 S.Ct. at 2300. We since have interpreted East River to mean that "it is the character of the plaintiff's loss that determines the nature of the available remedies." King v. Hilton-Davis, 855 F.2d 1047, 1051 (3d Cir.1988) (applying Pennsylvania law). In other words, "[w]hen loss of the benefit of a bargain is the plaintiff's sole loss, ... the undesirable consequences of affording a tort remedy in addition to a contract-based recovery [are] sufficient to outweigh the limited interest of the plaintiff in having relief beyond that provided by warranty claims." Id.
 
 
 58
 Although the Pennsylvania Supreme Court neither has rejected nor adopted the doctrine, the state's intermediate appellate courts and federal courts applying Pennsylvania law routinely have applied the East River principles. In REM Coal Co. v. Clark Equip. Co., 386 Pa.Super. 401, 563 A.2d 128 (1989) (en banc), the Superior Court held that "recovery in tort is barred in product liability actions between commercial enterprises where the only damage alleged is to the product itself." Id. at 132. As the court explained, "contract theories such as breach of warranty are specifically aimed at and perfectly suited to providing complete redress in cases involving ... economic losses." Id. at 129. Following the analysis of East River, the court pointed out that "such losses are based upon and flow from the purchaser's loss of the benefit of his bargain and his disappointed expectations as to the product he purchased. Thus, the harm sought to be redressed is precisely that which a warranty action does redress." Id. In New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp., 387 Pa.Super. 537, 564 A.2d 919, 925 (1989) (en banc), the court went still further, stating that "even in the absence of the parties' agreements, we would nevertheless hold that [the plaintiff's] recovery for damages pleaded in the negligence and strict liability counts is barred as a matter of law because the losses alleged are purely economic in nature and cannot be recovered in negligence or strict liability." Id. at 925; see also Grode v. Mutual Fire, Marine, and Inland Ins. Co., 154 Pa.Cmwlth. 366, 623 A.2d 933, 934 (1993).
 
 
 59
 In King we predicted that the Pennsylvania Supreme Court would apply the economic loss doctrine to preclude tort recovery against a manufacturer of a component of a product. King, 855 F.2d at 1051. And important in this context, in Lower Lake Dock Co. v. Messinger Bearing Corp., 395 Pa.Super. 456, 577 A.2d 631 (1990), the plaintiffs attempted to limit application of the economic loss doctrine to products liability cases, but the court quickly rejected the invitation. Rather, it indicated "appellants' distinction is without meaning. Our decision in REM Coal is not limited to products liability, but has equal application in negligence cases." Id. at 635.
 
 
 60
 Duquesne, however, argues that neither the economic loss doctrine specifically nor East River generally have any application here because Pennsylvania also has adopted the Restatement (Second) of Torts Sec. 552, which, Duquesne contends, governs all claims of negligent misrepresentation. Section 552 provides as follows:
 
 
 61
 Information Negligently Supplied for the Guidance of Others
 
 
 62
 (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
 
 
 63
 In Rempel v. Nationwide Life Ins. Co., 471 Pa. 404, 370 A.2d 366, 367 (1977), the Supreme Court of Pennsylvania noted that "the elements of the tort of negligent misrepresentations are stated in Section 552 of Restatement of Torts." See also Moffatt Enter., Inc. v. Borden Inc., 807 F.2d 1169, 1174 (3d Cir.1986). Duquesne, however, draws too many inferences from that statement.
 
 
 64
 First, Duquesne's argument relies on the inaccurate premise that section 552 conflicts with a broad interpretation of the economic loss doctrine. In Rempel the court did not engage in an analysis of the scope of section 552. See Rempel, 370 A.2d at 371. Rather, after the court cited the section, it simply analyzed the case in standard contract terms, albeit continuing to state that "this action is one in trespass for negligent misrepresentations rather than in assumpsit for breach of contract." Id. at 370. For example, in discounting the defendant's assertion that the contract terms trumped any representations that were made during pre-contract negotiations, the court relied not on section 552 but on the "adhesion" nature of insurance contracts. Thus, "[c]onsumers ... view an insurance agent ... as one possessing expertise in a complicated subject. It is therefore not unreasonable for consumers to rely on the representations of the expert rather than on the contents of the insurance policy itself." Id. at 368. Indeed, "[t]he idea that people ... are under no duty to read a written insurance policy is not novel." Id. at 369. And, importantly, the court pointed out that "[t]he application form, which is the offer being made by the consumer, could be prepared in large type in terms easily understood by the insured so that reliance on the agent's representations would not be necessary." Id. at 370. In other words, only because insurance contracts are written in arcane language that the ordinary consumer cannot understand, which in turn forces the consumer to rely on the agent's representations, is the consumer not bound by the contract language.
 
 
 65
 Further still, in holding the parol evidence rule inapplicable, the court again relied on contract rather than tort law. Specifically, the court discussed the contract principle that "the parol evidence rule is no bar to oral testimony designed to show that the writing is not an integrated writing." Id. at 371. In fact, the court noted that "[w]hether or not the parol evidence rule should be inapplicable in all misrepresentation cases is an issue we need not now decide." Id. at 370. Thus, notwithstanding the court's citation to section 552, its analysis relied almost exclusively on doctrines arising out of contract law. And to the extent that it relied on section 552, it was only because strict application of common law contract principles would have worked an injustice in the case in which the parties clearly had unequal bargaining power.
 
 
 66
 The implication, of course, is that if the parties to the contract were sophisticated business entities engaging in an arms-length transaction, ordinary contract principles would govern their relationship. Properly read, then, Rempel supports Westinghouse's, rather than Duquesne's, position.
 
 
 67
 Second, a close reading of section 552 itself reveals that the Restatement is concerned with liability in cases where contract remedies are unavailable. The section's imposition of liability on those who "suppl[y] false information for the guidance of others in their business transactions," does not lend itself very easily to a contract situation. Indeed, virtually all the examples provided in the section involve liability to third parties. The reason is simple: where there is privity in contract between two parties, and where the policies behind tort law are not implicated, there is no need for an additional tort of negligent misrepresentation. Breach of contract, promissory estoppel, unjust enrichment, and other contract or quasi-contract remedies all protect parties who negotiate and reduce their agreement to writing.
 
 
 68
 The economic loss doctrine, then, is not at odds with section 552, but only covers situations in which "a party in privity of contract with another suffers an injury to a product itself, resulting in purely economic loss." Grode v. Mut. Fire, Marine, and Inland Ins. Co., 623 A.2d at 934. There is no reason in principle to carve out an exception to this rule when the negligence consists of misrepresentation and Duquesne points to no reported opinion doing so. Indeed, courts in jurisdictions which have adopted the economic loss doctrine routinely have declined to carve out an exception for claims of negligent misrepresentation. See Eagle Traffic Control v. Addco, 882 F.Supp. 417, 419 (E.D.Pa.1995) (applying Pennsylvania law) (economic loss doctrine applies to claims of negligent misrepresentation); Apollo Group, Inc. v. Avnet, Inc., 58 F.3d 477, 480 (9th Cir.1995) (applying Arizona law) ("negligent misrepresentation is not an exception to the 'economic loss' rule."); Bailey Farms, Inc. v. NOR-AM Chem. Co., 27 F.3d 188, 191 (6th Cir.1994) (applying Michigan law) (same). The economic loss doctrine is designed to "maintain[ ] the separate spheres of the law of contract and tort." New York State Elect. & Gas. Corp., 564 A.2d at 925. A party who engages in contractual negotiations with another has the ability to protect itself in the contractual language against the other party's innocent, though wrong representations.
 
 
 69
 We therefore predict that the Pennsylvania Supreme Court would apply the economic loss doctrine in this case, and we affirm the district court's grant of summary judgment.
 
 III. CONCLUSION
 
 70
 For all the reasons detailed above, we will affirm the orders and judgments of the district court in their entirety.[15]
 
 
 
 [1]
 The court divided Duquesne's section 1962(c) claim into two parts, and granted summary judgment on one of them. Thus, the court granted Westinghouse's motion insofar as the claim was based on the "Nuclear Supplier Enterprise" but denied it insofar as it was based on the "Beaver Valley Project Enterprise."
 
 
 [2]
 Westinghouse has filed a notice of appeal from the district court's denial of most of its motion for summary judgment. We are dismissing the appeal and striking the additional brief Westinghouse filed in support of that appeal
 
 
 [3]
 The parties as well as the district court all agreed that Pennsylvania law governs the state law claims. Accordingly, we apply Pennsylvania law
 
 
 [4]
 According to the transcript the court did say 141 rather than 140 hours
 
 
 [5]
 The one exception is Duquesne's conclusory statement that it "could have presented even more evidence [supporting its RICO claim] if [its] trial time had not been arbitrarily and unfairly cut in half by the district court." Br. at 46 n. 33
 
 
 [6]
 Gibbs v. Ernst, 538 Pa. 193, 647 A.2d 882, 889 n. 12 (1994), did not change things. In that case, the Supreme Court of Pennsylvania noted that "[t]he tort of intentional non-disclosure has the same elements as the tort of intentional misrepresentation except that in a case of intentional non-disclosure the party intentionally conceals a material fact rather than making an affirmative misrepresentation." While the Court did not expressly point out the duty to speak requirement, in reaching its conclusions it relied on Neuman v. Corn Exchange Nat'l Bank & Trust, Wilson v. Donegal Mut. Ins. Co., and Smith v. Renaut. Those cases, which go into more detail on the subject, all imply a duty to speak requirement
 
 
 [7]
 Duquesne cites to portions of Westinghouse's closing statement as prejudicing its post-contract allegations, but it does not appear that Duquesne preserved its objections to the closing argument
 
 
 [8]
 Except for this provision, Duquesne cites contract clauses that do not even relate to the life of the components
 
 
 [9]
 When pressed further, Duquesne's witness' testimony confirms the lack of merit in Duquesne's contract language-based argument:
 A: ... I don't believe that this paragraph was intended in any way to suggest that only those components subject to high neutron radiation would be designed for 42 years, but this paragraph was intended to ask for particular attention to be paid those components.
 Q: Well, can you show me any provision in the bid specification, because I haven't been able to find it, that states the steam generators shall last for 40 years? Can you find that language any place in the bid specification, Mr. Campbell?
 A: I don't know that I can, but it was generally understood by all concerned that the plant was expected to last for more than one year. It wasn't expected to last for all eternity, but it was expected to last for some reasonable number of years, and that reasonable number of years, it was understood, was about 40 years.
 App. 489. Of course, the parties' expectations, standing alone, are irrelevant without any contractual hook on which to pin them. For example, if the contract provided that the steam generators would "last for a reasonable period of time," the analysis would perhaps be different. In such a case, not only would a factfinder need to define "reasonable," but the duty of good faith, discussed infra, might affect a determination of the parties' reasonable expectations.
 
 
 [10]
 Based on Duquesne's counsel's comments at oral argument, we expect Duquesne to protest that we are confusing its contractual argument with its warranty claim. If so we stand accused. In point of fact, we do believe that Duquesne's contract-based argument is simply a back-door means of expanding the warranty period beyond what the parties bargained for
 
 
 [11]
 Duquesne purchased extensions of the warranties but it does not claim that the defects appeared within the extension periods
 
 
 [12]
 In so doing, we reject Duquesne's argument that Westinghouse is equitably estopped from relying on the time limits contained in the warranty clause
 
 
 [13]
 We agree with the parties' assumption that the Uniform Commercial Code applies. Nonetheless, Pennsylvania courts applying the U.C.C. definition of good faith generally use common law contract principles. See Somers v. Somers, 418 Pa.Super. 131, 613 A.2d 1211, 1214 (1992) (equating Restatement and U.C.C. duties of good faith.)
 
 
 [14]
 We reject Duquesne's tenuous attempts to tie the duty of good faith to particular provisions of the contract
 
 
 [15]
 Duquesne also contends that the district court erred in granting Westinghouse's Rule 50(a) motion on its RICO claim. We have considered Duquesne's argument and find it to be without merit